Glen R. EAVES, Alleen M. Eaves, Violet Cobbs, Richard Eades, Ralph D. Sitton, and Marguirite Richards, Plaintiffs-Appellees,

v.

Ralph W. PENN, Individually, and Ralph W. Penn as Trustee for Glen's Employees Retirement Plan, Defendant-Appellant,

Ray MARSHALL, Successor to W. J. Usery, Jr., Secretary of Labor, Plaintiff-Appellee,

v.

Ralph W. PENN, Individually and as Trustee of Glen's Profit-Sharing Plan, Defendant-Appellant,

and

Glen R. Eaves and Alleen M. Eaves, Defendants-Appellees.

Nos. 77–1169 to 77–1171.

United States Court of Appeals, Tenth Circuit.

Submitted Sept. 25, 1978.

Decided Nov. 21, 1978.

As Amended Dec. 4, 1978.

**454**

Robert P. Gallagher, Washington, D. C. (Carin Ann Clauss, Monica Gallagher, Mary S. Calfee, Dept. of Labor, Washington, D. C., and Ronald M. Gaswirth, Dallas, Tex., on the brief), for appellee Marshall.

Howard Lynn Wisdom, Oklahoma City, Okl. (Billy Jack Hendrix, Oklahoma City, Okl., on the brief), for appellees Eaveses.

Before BARRETT and DOYLE, Circuit Judges, and STANLEY, District Judge.*

BARRETT, Circuit Judge.

These consolidated appeals present issues concerning the standards of conduct of fiduciaries under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.* Ralph W. Penn (Penn), individually and as a trustee of the Glen's Profit-Sharing Plan, appeals an adverse determination of the trial court that he failed to discharge his duties with respect to the plan. Specifically, the court found that Plan failed to act solely in the interest of the plan's participants and beneficiaries and with the care, skill, prudence and diligence that a prudent man acting in a like capacity under the prevailing circumstances would exercise in the conduct of an enterprise of a like character and with like aims, as required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). The Secretary of Labor and the private plan participants seek review of the District Court's order as it relates to an award of attorneys fees to be paid to counsel for the private plan participants out of the assets recovered on behalf of the plan.

The Glen's Profit-Sharing Plan (Plan) was instituted in 1958 to provide retirement benefits to participating employees of the company, which engaged in the restaurant business in Oklahoma City, Oklahoma. The Plan provided, in essence, that the company would make contributions to the Plan annually in an amount of not less than 5% of the company's net profits. Contributions, forfeitures, and all income of the trust would be allocated to the participants' individual accounts annually. Distributions to the

Jon H. Trudgeon of Speck, Philbin, Fleig, Trudgeon & Lutz, Oklahoma City, Okl., for appellant.

---

* Of the District of Kansas, sitting by designation.

participants were to be made in five equal annual installments in cash. The Plan specifically prohibited any amendment which would impair the rights of the participants without their prior consent or which permitted any part of the trust fund to be used for purposes other than for the exclusive benefit of the participants or beneficiaries.

On December 31, 1975, the Plan had approximately 41 participants and assets of approximately $522,000 which were held by Glen R. Eaves, as trustee of the Plan, principally in certificates of deposit. From its inception through 1976, the plan received contributions from the company almost yearly. Until January, 1976, participants received their distributions in cash upon retirement.

During the fall of 1975, Penn entered into discussions with Mr. and Mrs. Eaves, who owned the outstanding stock of the company, which cumulated in the execution of an agreement on December 17, 1975, for the sale of the company for $1,038,139.13. Even though Penn was named as a buyer, pursuant to the agreement, virtually all the purchase money was to be derived either from the existing assets of the Plan or from the assets held or to be borrowed by the company and funneled through the Plan.

Specifically, the agreement, as modified by addenda, provided that the Eaveses, prior to closing, would resign as officers and directors of the company and as fiduciaries of the Plan and cause those offices to be filled by persons designated by Penn. It further provided that Penn would amend the Plan to permit it to acquire employer stock, make an advanced contribution to the Plan from the company's assets, and then cause the Plan to pay to the Eaveses $1,013,134.01 in consideration for 6,807 shares of the outstanding stock of the company, which would then be transferred by the Eaveses to the Plan. Penn would pay to the Eaveses the sum of $25,005.12 for the remaining 168 shares of company stock.

On January 16, 1976, Penn and the Eaveses met, as agreed, and carried out the purchase-sale contract. The Eaveses resigned as officers and directors of the com-

pany. Penn became vice president, treasurer and a member of the board of directors. Juanita Boedeker and Charlotte Robison, designees of Penn, also became directors of the company. Glen R. Eaves resigned as the trustee of the Plan and was replaced by Penn. Alleen Eaves resigned as a member of the Plan committee, which, under the original Plan instruments, exercises discretion over the administration of the Plan and other matters. Penn, Robison, and Boedeker then became members of that committee. Penn, as trustee of the Plan, then amended the profit-sharing plan by substituting in its place the Glen's Employees Stock Ownership Plan and Trust (New Plan). The participants and beneficiaries of the Plan did not give their prior specific consent to the amendment of the Plan, with the exception of Glen R. Eaves, Chris B. Randall, president of Glen's under the New Plan, and Kay Harrison. Penn, on behalf of Glen's, Inc., made an advance contribution to the New Plan of $490,998.34. The advance contribution consisted of $215,998.34 drawn from the operating capital and liquid assets of Glen's, Inc., and $275,000.00 obtained by Glen's, Inc. as the partial proceeds of a loan made by the Will Rogers Bank on January 16, 1976. This loan was secured by a first mortgage on all of the real property and improvements of Glen's, Inc.

The New Plan was framed in the form of an employee stock ownership plan (ESOP). It provided, in essence, that contributions thereto would be made in shares of company stock or in cash, at the sole discretion of the board of directors. Plan assets, to the extent practicable, would be invested in shares of Glen's, Inc., as directed by the company. Distributions to participants under the New Plan were to be made in shares of company stock only and at the discretion of the plan committee, in equal annual installments over a period of years not to exceed the participants' life expectancy. The New Plan had a right of first refusal to purchase the shares of Glen's, Inc., distributed to participants. Participants, however, had no right to require the New Plan or the company to purchase

shares of the company distributed to them. Shares of the company held by the New Plan trustee on behalf thereof would be voted by the New Plan committee.

As trustee of the New Plan, Penn then paid the $490,998.34 contribution and transferred all the Plan's pre-existing assets of $522,135.67 to the Eaveses in consideration for 97% of the stock of the company which was conveyed to Penn as trustee of the New Plan. Penn personally purchased the remaining 168 shares of company stock from the Eaveses for $25,005.12, $25,000.00 of which had been borrowed by Penn from the company.

As a result of the purchase-sale transaction, Penn, personally and as trustee of the New Plan, acquired all of the outstanding stock of the company. He was named to the positions of trustee of the New Plan, chairman of the board of directors, a member of the New Plan committee, and the vice president of Glen's, Inc.

Although the stock of the company had never been publicly traded or had a ready market, the company, prior to its sale to Penn and the New Plan, enjoyed a strong financial condition. The company had $114,376.00 in cash, current liabilities of $88,398.00, marketable securities valued at $152,616.00, other current assets of $120,-441.00 and long term liabilities of $60,-000.00.

As a result of the advance contribution made to the plan as a part of the purchase-sale transaction, the value of the company's shares was reduced by approximately $500,-000.00. The effect of that contribution, combined with Penn's mismanagement of the company, caused the company to suffer severe financial reverses. Net operating losses for the first nine months of 1976 totaled $121,577.00. As of September 30, 1976, the company had a bank overdraft of $32,964.00, current assets of $105,900.00, current liabilities of $168,517.00, and long-term liabilities of $362,265.00. The stockholders' equity in the company dropped from its pre-sale value of $746,711.00 to a current value of approximately $76,000.00, discounting the value of the $490,988.34 ad-

vance contribution which is not properly regarded as an asset of the company.

The District Court found that the company did not have sufficient assets, nor did the company or New Plan have any design or obligation, to repurchase shares of stock distributed to retired participants under the terms of the New Plan.

The District Court's findings of fact and conclusions of law are reported at 426 F.Supp. 830 (W.D.Okl.1976). The Court found, inter alia: that Penn and the Eaveses failed, in violation of ERISA § 404, to discharge their fiduciary duties with respect to the Plan solely in the interest of its participants and for the exclusive purpose of providing benefits to participants and to defray the reasonable expenses of administration; that Glen R. Eaves and Penn failed to discharge their fiduciary duties with respect to the Plan prudently under the circumstances when they entered into the sale agreement and when they performed under the terms thereof; and that Alleen Eaves failed to discharge her duties with respect to the Plan prudently when she failed to take reasonable steps in performance of the purchase-sale agreement.

On the basis of its extensive findings and conclusions, the District Court ordered equitable relief designed to restore the Plan and its participants to the positions in which they would have been but for the defendants' unlawful acts. That relief included rescission of the sale transaction, restoration of lost income to the plan, and removal of the culpable fiduciaries. In addition the Court also awarded attorneys fees to be paid from the assets recovered on behalf of the Plan to compensate the attorneys for the private Plan participants for their efforts on behalf of named and unnamed plan participants, with the exception of the Eaveses.

The issues presented on review are whether the District Court erred in: (1) holding that the conduct of Penn, as a fiduciary of the employee pension benefit plan, violated § 404 of the Employee Retirement Income Security Act of 1974 (ERISA), (2) ordering equitable relief which included

rescission of the unlawful transaction and restoration of income lost to the Plan, (3) admitting certain evidence relating to events which occurred subsequent to the purchase-sale transaction, and (4) making an award of attorneys fees to counsel for the Plan participants, to be paid out of the assets recovered on behalf of the Plan.

## I.

We first consider Penn's challenge to the District Court's findings and conclusions that he violated the fiduciary standards of §§ 404(a)(1)(A) and (B) of the Employee Retirement Income Security Act of 1974 (ERISA).

The Employee Retirement Income Security Act of 1974 is a comprehensive remedial statute designed to "protect . . . the interests of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." ERISA § 2(b), 29 U.S.C. § 1001(b).

A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a), 29 U.S.C. § 1104(a) which provides as follows:

§ 1104.  Fiduciary duties

(a)(1) Subject to sections 403(c) and (d) [29 U.S.C. § 1103(c) and (d)] 4042 [29 U.S.C. § 1342], and 4044 [29 U.S.C. § 1344], a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title.

(2) In the case of an eligible individual account plan (as defined in section 407(d)(3) [29 U.S.C. § 1107(d)(3)]), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 407(d)(4) and (5) [29 U.S.C. § 1107(d)(4) and (5)]).

The above provisions embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act. Certain sections of ERISA supplement these fundamental standards by expressly prohibiting numerous specific transactions between the plans and their affiliated "parties in interest" and by placing limits on the acquisition and holding of employer securities and real property by plans. *See* ERISA §§ 406 and 407, 29 U.S.C. § 1106 and § 1107. Counterbalancing these duties and prohibitions are certain statutory and administrative exemptions. *See* ERISA § 408, 29 U.S.C. § 1108.

At the outset, we consider the question of whether or not Penn's activities in recommending, designing and implementing amendment of the original profit-sharing plan to an employee stock ownership plan fall within the purview of the fiduciary responsibilities codified in ERISA § 404(a)(1).

Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) states that a person is the fiduciary with respect to a plan:

.  .  . *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such a plan or exercises any authority or control respecting management or disposition of its assets, *(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan,* or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. .  .  . (Emphasis supplied.)

In a recent Law Review article on the subject, the authors stated:

.  .  . The term [fiduciary] includes anyone who exercises discretion in the management of assets, renders investment advice for a fee, or possesses discretionary authority with regard to plan administration. The broadness of the definition is readily apparent. Plan officers, directors, and members of the investment or administrative committee are certainly fiduciaries since they exercise discretionary authority or control over plan management and asset disposition. Similarly, officers and directors of the plan sponsor are fiduciaries if they exercise control through the selection of the investment committee, administrative committee, or plan officers or directors. Because the definition includes those who render investment advice for a fee, the following persons may be considered fiduciaries: .  .  . attorneys who counsel the employer, investment committee, or trustee with regard to an appropriate portfolio mix or with regard to specific investments, and receive a fee for these services; .  .  . [and] .  .  . stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of those securities and receive a commission for their services. (Footnotes omitted.)

Little and Thrailkill, *Fiduciaries Under ERISA: A Narrow Path to Tread,* 30 Vanderbilt L.Rev. 1, 4–5 (1977).

■ As an officer and director of the company, Penn argues that he is not a fiduciary within the meaning of the Act, and, as such, in recommending, designing and implementing amendment of the original profit-sharing plan to an employee stock ownership plan, he was not bound by the fiduciary standards of § 404(a). We disagree.

We do not accept Penn's characterization of his Plan design activities as non-fiduciary actions. It is apparent that during his negotiations with the Eaveses surrounding the purchase of the company, Penn recommended to Glen R. Eaves, then the trustee of Glen's Profit-Sharing Plan, that the Plan invest large sums of money in company stock in order to finance the purchase—sale transaction. In rendering such advice, Penn sought and eventually obtained control of the company's affairs through his acquisition of legal title to all outstanding shares of stock. By virtue of his ownership, and his position as trustee of the New Plan, Penn became chairman of the board of directors, vice president and treasurer of the company and a member of the New Plan committee. It is uncontradicted that prior to his employment by Glen's, Inc., Penn had not received compensation from any employer in excess of $25,000.00 per year. At trial, evidence was admitted, over Penn's objection based upon irrelevancy grounds,[1] that he was compensated by Glen's, Inc., at a rate in excess of $40,000.00 per year. It is also uncontested that Penn borrowed $25,-000.00 from Glen's, Inc., in order to finance his purchase of the individual shares of stock of Glen's, Inc., from Glen R. Eaves and Alleen M. Eaves. Finally, evidence was introduced, over Penn's objection, that he had caused several loans to be made to himself from the assets of Glen's, Inc., since

---

1. The propriety of the trial judge's admission of this evidence is the subject of Part III of this opinion.

his acquisition of control on January 16, 1976. These facts establish that Penn received indirect compensation for his investment advice. Accordingly, we hold that under the unique circumstances of this case, Penn, in recommending, designing and implementing amendment of the profit-sharing plan to an employee stock ownership plan, acted in a fiduciary capacity under the Act.

Penn next contends that as trustee of the employee stock ownership plan, he was bound by the terms of the Plan itself and § 404(a)(1)(D) of ERISA to invest the Plan's funds in employer securities unless compliance was impossible, illegal, or directly inconsistent with a *specific* prohibition of ERISA such as the prohibited transactions enumerated in § 406 of ERISA, 29 U.S.C. § 1106. Since employee stock ownership plans, by definition, are ". . . designed to invest primarily in qualifying employees securities . . . ." (ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6)), Penn reasons that to hold otherwise would frustrate the primary purpose underlying the development of ESOPS. In other words, Penn postulates that because ERISA permits employee stock ownership plans, the fiduciary administering the plan, in accordance with plan documents, will be deemed to have met the "exclusive benefit" and "prudent man" requirements of § 404(a)(1) so long as the investment in qualified employers securities is not inconsistent with any *specific* prohibition of the Act. In our view, however, the language or § 404 of ERISA refutes this contention. The only statutory limitation applicable to § 404 is contained in Section 404(a)(2) which provides that ". . . in the case of an eligible individual account . . ., the diversification requirement of paragraph (1)(C) and the prudence requirement (*only to the extent that it requires diversification*) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities . . . ." (Emphasis supplied.)

While an ESOP fiduciary may be released from certain *per se* violations on investments in employer securities under the provisions of §§ 406 and 407 of ERISA, the structure of the Act itself requires that in making an investment decision of whether or not a plan's assets should be invested in employers securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the "solely in the interest" and "prudence" tests of §§ 404(a)(1)(A) and (B).

It is stated in House Conf.Rep. No. 93–1280, 93d Cong., 1st Sess., *Reprinted* [1974] U.S.Code Cong. & Admin.News, p. 5038:

> If securities are qualifying employers securities they generally can be acquired or held notwithstanding the prohibited transaction rules, if acquisition is for adequate consideration and no commission is charged and if acquisition is allowed by the employers security rules. . . .
> *Thus, while a plan may be able to acquire employers securities or real property under the employers security rules, the acquisition must be for the exclusive benefit of participants and beneficiaries. Consequently, if the real property is acquired primarily to finance the employer, this would not meet the exclusive benefit requirement.* . . . (Emphasis supplied.)

House Conf.Rep. No. 93–1280, 93d Cong., 1st Sess., *Reprinted* [1974] U.S.Code Cong. & Admin.News, pp. 5038, 5100.

The legislative history underlying ERISA § 408 also buttresses the conclusion that ESOP fiduciaries are governed by the "solely in the interest" and "prudence" tests of §§ 404(a)(1)(A) and (B). Senate Report No. 93–127, 93d Cong., 1st Sess., *Reprinted* [1974] U.S.Code Cong. & Admin.News, p. 4838 discusses the legislative history underlying the exemption from prohibited transaction rules found in § 408 of ERISA, 29 U.S.C. § 1108. On page 4867 of the reprinted report, the Committee discusses the necessity for the inclusion of specific listed transactions in which fiduciaries are expressly allowed to engage, such as the acquisition or sale by a plan of qualifying employer securities:

> Next, there are listed transactions in which fiduciaries are expressly allowed to

engage. This listing is necessary for reasons similar to those which required inclusion of the exemption provision. That is, the breadth of proscriptions, which was considered necessary for the reasons stated above, would operate in some cases to prohibit transactions which were deemed desirable to sound, efficient functioning of employee benefit plans. It was, therefore, necessary to specify that certain transactions, likely to be engaged in by fiduciaries of virtually all plans, will be allowed notwithstanding the proscriptions.

*It is emphasized, however, that even with respect to the transactions expressly allowed, the fiduciaries' conduct must be consistent with the prudent man standard.*

\* \* \* \* \* \*

In recognition of the special purpose of profit-sharing and similar plans, the [10%] limitation does not apply to such plans if they explicitly provide for greater investment in the employer securities, nor should any diversification principle that may develop from application of the prudent man principle be deemed to restrict investment by profit-sharing plans in employer securities. . . . (Emphasis supplied.)

Finally, the committee in the same Senate Report, at page 4866 of the reprinted edition, explains the purpose of § 404 of ERISA as follows:

Subsection 15(a)(b) and (c) incorporate the core principles of fiduciary conduct as adopted from existing trust law, but with modifications appropriate for employee benefit plans. *These salient principles place a two fold duty on every fiduciary: to act in his relationship to the plan's fund as a prudent man in a similar situation and under like conditions would act, and to act consistently with the principles of administering the trust for the exclusive purposes previously enumerated, [found in § 404] and in accordance with the documents and instruments governing the fund unless they are inconsistent with the fiduciary principles of this section.* (Emphasis supplied.)

The above-quoted sections of the legislative history combined with a natural and clear reading of § 404, lead to the inexorable conclusion that ESOP fiduciaries are subject to the same fiduciary standards as any other fiduciary except to the extent that the standards require diversification of investments. Therefore, we hold that Penn's activities as trustee and sponsor of the employee stock ownership plan were subject to both the "solely in the interest" and prudence tests of § 404(a)(1)(A) and (B).

Finally, Penn contends that the Court erred in its findings of fact Nos. 14, 15 and 21.

On appeal, we must view the evidence and all reasonable inferences therefrom in the light most favorable to the prevailing party. *Joyce v. Davis*, 539 F.2d 1262 (10th Cir. 1976). It is not the function of the court of appeals to infer material facts which, if done, would in effect constitute trial *de novo*. *Transport Equipment Company v. Guaranty State Bank*, 518 F.2d 377 (10th Cir. 1975). A reviewing court is bound by reasonable inferences drawn by the trier of facts. *Quad Construction, Inc. v. William A. Smith Contracting Company, Inc.*, 534 F.2d 1391 (10th Cir. 1976). Where there is substantial evidence to support the findings of the trial court, judgment entered thereon should, on appeal, be upheld. *United States for Use and Benefit of Clark Engineering v. Freeto Construction Company*, 547 F.2d 537 (10th Cir. 1977); *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1974). Findings of a trial court will not be disturbed on appeal unless they are clearly erroneous. Federal Rules of Civil Procedure, Rule 52, 28 U.S.C.A.; *Volis v. Puritan Life Insurance Company*, 548 F.2d 895 (10th Cir. 1977). Applying these standards to the case at bar, we hold that Penn's allegations of error are without merit.

*Finding of Fact No. 14.*

Penn assigns error to the District Court's finding that Penn, by virtue of his owner-

ship of the stock of the company, personally and as trustee of the Plan, exercised complete control over the company and the Plan. Penn rests that assignment on his own testimony that he made Mr. Randall president of the company because of Randall's experience in the business and that, as president, Randall had control of the business.

The testimony on which Penn relies was credibly impeached at trial by his own prior depositional testimony (Appendix 36, pp. 75–79, 83, 125) which aptly demonstrates that Penn controlled the company and that he made Randall president for cosmetic reasons. Randall himself later testified:

Q. Are you also second in command at Glen's, Inc.?

A. Yes, I am.

Q. Who are you second in command to, sir?

A. Mr. Ralph Penn.

[R., Vol. XI, at pp. 166–167.]

Based on this testimony, and the fact that Penn was trustee of the Plan, a member of the Plan committee, chairman of the board of directors, vice president and treasurer of the company, we cannot hold that the District Court erred in finding that Penn exercised complete control over the affairs of Glen's, Inc. and the Plan.

### Finding of Fact No. 15.

Penn also asserts that the Court erred in finding that the Plan committee, as reconstituted on January 16, 1976, did not have authority to nor did it advise Penn with respect to the investment of Plan assets in the stock of Glen's, Inc.

Penn's assertion relies on the testimony of Randall—that he discussed with Penn a distribution to be made to a participant [R., Vol. XI, p. 186] and the testimony of Robison—that she thought that the duties of the committee included advising the corporation how to "administer" the Plan [R. Vol. XI, p. 230] and that she had "sat in" on discussions about the Plan but did not offer any advice [R., Vol. XI, p. 234].

The New Plan, does not contain any suggestion that the committee is to advise the trustee with respect to New Plan investments. The New Plan states that "the trustee shall have the sole responsibility for the administration of the trust and the management of the assets held under the trust all as specifically provided in the trust." [Appendix 21.] Both Randall and Robison testified that they gave Penn no advice regarding the purchase of company stock with plan assets:

*Randall:*

Q. Have you ever, since the 16th of January, as a plan committee member and fiduciary, told Mr. Penn what to do with the plan assets?

A. No.

[R., Vol. XI, p. 205.]

*Robison:*

Q. And you didn't have, really, an effective function in the profit sharing plan committee capacity, did you?

A. No.

    \*    \*    \*    \*    \*    \*

Q. And you never had a real function as a plan committee member, did you, M'am?

A. We never had a meeting. There was not a reason to have a function.

Q. And you didn't tell Mr. Penn where he could invest plan investments, did you?

A. No.

Q. And you didn't tell him what to invest in, did you?

A. No.

We hold that the trial court did not err in this finding.

### Finding of Fact No. 21:

As to Finding of Fact No. 21, Penn asserts that the Court erred in finding that the company did not have money to redeem stock distributions made to retirees under the New Plan. We hold that the Court's finding is clearly supported by the testimony of Norman Foster, a certified public accountant, who appeared as an expert witness, the testimony of Juanita Boedeker and by documentary evidence [Appendix 34, 39, 40, 41.]

Although the testimony of Juanita Boedeker indicates that the cost to Glen's, Inc. to redeem one-fifth of the shares of stock due to eligible participants and beneficiaries under the New Plan in January, 1977, valued at the price per share paid by the New Plan for the stock, was approximately $69,000.00, rather than $74,000.00, as found by the trial court, we hold that the discrepancy, when viewed with the other facts of the case, is harmless error.

In summary, we hold that the District Court correctly concluded that Ralph W. Penn was, at all times relevant to the action, a fiduciary with respect to the Glen's Profit-Sharing Plan and that he violated §§ 404(a)(1)(A) and (B) of ERISA by entering into, and accepting performance under the purchase—sale agreement.

## II.

Penn contends that the District Court's order rescinding the purchase-sale transaction and restoring lost profits to the fund is contrary to the statutory scheme of the Employee Retirement Income Security Act of 1974 and the maxims of equity. We disagree.

Section 409 of ERISA, 29 U.S.C. 1109 provides:

*Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief that the court may deem appropriate,* including removal of such fiduciary. . . . (Emphasis supplied.)

The reports of the various committees concerning this section of ERISA make it clear that Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty.

The enforcement provisions have been designed specifically to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Retirement Income Security for Employees Act . . . . The intent of the committee is to provide the full range of legal and equitable remedies available in both state and federal courts . . . .

S.Rep. No. 93–127, 93d Cong., 1st Sess., *Reprinted* [1974] U.S.Code Cong. & Admin.News, pp. 4838, 4871.

In developing a law of remedies, the Congress intended the federal courts to draw on principles of traditional trust law:

The objectives of these provisions are to make applicable the law of trusts; . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breaches of trust.

Statement of the Honorable Harrison A. Williams, Jr., 120 Cong.Rec. S–15737, August 22, 1974, *Reprinted* [1974] U.S.Code Cong. & Admin.News, pp. 5177, 5186.

■■ Traditional trust law provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty. In addition to specific remedies for recovery of profits obtained by fiduciaries by use of plan assets, trust law provides the alternative remedy of restoring plan participants to the position in which they would have occupied but for the breach of trust. *Restatement (Second) of Trusts*, § 205, Comment a. Generally, in the absence of an election of a particular remedy by all beneficiaries, the court has a duty to enforce the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust. *Restatement (Second) of Trusts*, § 214. Among the factors which the court may consider in selecting a remedy are: (1) the purposes of the trust; (2) the relative pecuniary advantages to the trust estate of the various remedies; (3) the nature of the interest of each beneficiary; (4) the practical availability of the various remedies; and (5) the

extent of the deviation from the terms of the trust required by the adoption of each of the remedies. *Restatement (Second) of Trusts,* § 214 Comment to Subsection (2, b).

In detailed and considered findings of fact, the District Court found that the "primary purpose of the profit-sharing plan, since its inception, has been to provide retirement income to participants. The participants of the profit-sharing plan relied on the plan for retirement income." Under the original profit-sharing plan distributions to participants and beneficiaries were to be made in five equal annual installments in cash.

However, with the adoption of the employee stock ownership plan (New Plan), distributions to the beneficiaries were to be made in shares of company stock and at the discretion of the New Plan committee in equal annual installments over a period of years not to exceed the participants' life expectancy. Under the terms of the New Plan, beneficiaries have no right to require the plan or the company to repurchase shares of stock distributed to them. The court specifically found that shares of Glen's, Inc. were not publicly traded and have no ready market. Moreover, the court found that the purchase-sale agreement resulted in substantial impairment of New Plan assets, and that this impairment, together with the subsequent dealings of Penn, resulted in a situation in which the vested participants' legitimate expectations of cash distributions upon retirement or termination were severely jeopardized.

Based on these findings of fact, we hold that the District Court, in the exercise of its discretion, properly concluded that rescission of the purchase-sale agreement—which restored the plan's original liquid assets—was the remedy most likely to protect the plan participants and effectuate the purposes of the original profit-sharing plan.

Penn also challenges the District Court's order which requires the offending fiduciary to restore to the New Plan an amount representing the contribution that would have been made by the company to the plan in 1976 but for the unlawful transaction.

The Court required the offending fiduciaries to restore to the New Plan an amount equal to the median contribution by the company to the Plan for the preceding five years.

Comment I to § 205 of the *Restatement (Second) of Trusts,* provides that:

If the trustee commits a breach of trust, he is chargeable with any profit which would have accrued to the trust estate if he had not committed such a breach of trust.

The law clearly permits approximations as to the extent of damage, so long as the fact of damage or "lost profits" is certain. In such cases, "it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Company v. Patterson,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1930).

Penn finally argues that the court's order of rescission violates the "clean hands" maxim of equity in that the relief ordered by the Court included the return of the company to the Eaveses, who were also found to be breaching fiduciaries. While it is true that the "clean hands" maxim directs the court not to aid a wrongdoer who seeks the court's aid in order to benefit himself by rescinding an unlawful transaction, here the Court rescinded an order to aid and protect innocent participants from the conduct of Penn and the Eaveses by returning the Plan to its original position, thus reinstating its original liquid assets, and restoring lost income to the Plan. Significantly, the Court did not, however, permit the Eaveses to resume their position as Plan fiduciaries. If the trial court had refused the remedy of rescission, it would have ignored the interest of the participants. The "clean hands" maxim has no play in situations where it would result in substantial harm to innocent parties.

### III.

At trial, evidence was admitted, over Penn's objection, concerning the financial

status and conduct of Glen's, Inc. subsequent to the purchase-sale agreement. The evidence shows, among other things that: Penn had authorized several loans to be made to himself, and other businesses and acquaintances, by and from the assets of Glen's, Inc.; Penn purchased a restaurant located in Norman, Oklahoma, which is now known as Glen's Hickory Pit No. 2, and that during the operation of that restaurant, Penn provided substantial quantities of food from Glen's Inc. to Hickory Pit No. 2 for unreasonably low prices; that Glen's, Inc. suffered severe financial reverses since Penn's takeover; and Penn received approximately $15,000.00 more per year in compensation than he received from any employer in previous years.

Penn's assertion at trial, and on appeal, is that the abovementioned evidence is irrelevant to the determination whether or not he fulfilled his fiduciary duties at the time of the purchase-sale transaction.

Under rule 404(b) of the Federal Rules of Evidence, evidence of other acts is admissible for such purposes as proving motive, opportunity, or intent. The record in this case indicates that the trial court overruled Penn's objection on the ground that evidence concerning events subsequent to the purchase-sale transaction could tend to prove Penn's intentions at the time he agreed to purchase the company. Accordingly, we hold that the District Court's admission of this evidence was not erroneous.

### IV.

■ The Secretary of Labor asserts that the District Court exceeded its discretion in making an award of attorneys fees to be paid to counsel for Plan participants from the assets recovered on behalf of the Plan. Counsel for the private plan participants, on the other hand, argues that the District Court was correct in awarding attorneys fees from the assets recovered on behalf of the Plan, but urges that the trial court erred as to the amount of attorneys fees to be paid to counsel for the private plan participants.

ERISA § 502(g), 29 U.S.C. § 1132(g) provides:

In any action under this title by a participant, beneficiary, or fiduciary, the court in its discretion may allow reasonable attorney's fee and costs of action to either party.

The district court's award of attorneys fees from plan assets is based on the "common fund" theory. In *Mills v. Electric Auto-Light Company,* 396 U.S. 375, 391–392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970), the Supreme Court articulated the philosophy underlying the "common fund" doctrine as follows:

While the general American rule is that attorneys' fees are not ordinarily recoverable as costs, both the courts and Congress have developed exceptions to this rule for situations in which overriding considerations indicate the need for such recovery. A primary judge-created exception has been to award expenses where a plaintiff has successfully maintained his suit, usually on behalf of a class, that benefits a group of others in the same manner as himself. . . . To allow the others to obtain full benefits from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.

The use of the "common fund" theory most often occurs in actions seeking equitable relief where specific statutory guidelines underlying the award of attorneys fees are not available. *See,* Wright & Miller, *Federal Practice and Procedure:* Civil § 2675 (1973).

We believe that ERISA § 502(g), 29 U.S.C. § 1132(g), as a specific statutory authorization of attorneys fees, will, in most cases, eliminate the necessity which gave rise to the common fund exception to the American rule. By enacting a statutory authorization for award of attorneys fees, we believe Congress intended that the offending party bear the costs of the award, rather than non-culpable, non-party plan participants. The fact that the court, in its discretion, may allow reasonable attorneys

fees to *either* party buttresses this conclusion. Obviously, should a defendant-fiduciary prevail in a particular case, no common fund would be generated and the defendant would be forced to look only to the litigating parties for payment of fees.

It should be noted, however, that we do not absolutely preclude the application and use of the "common fund" theories in lawsuits brought under ERISA. Rather, we believe that the court should have considered the following factors in determining whether or not to award fees from the Plan fund or against the offending parties personally: (1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to personally satisfy an award of attorneys fees; (3) whether or not an award of attorneys fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position. We cannot ascertain from the record the extent to which the District Court considered these factors.

We deem it necessary to remand this case for determination of whether or not the "common fund" theory should apply or attorneys fees should be awarded personally against the breaching fiduciaries.

We do not reach the reasonableness of the amount of the District Court's award of attorneys fees inasmuch as the private plan participants' counsel expressly stated that he "would prefer to rely upon the opinion of this court [the District Court] and the evidence introduced at the time of the actual trial relating to the reasonableness and source of payment of attorneys fees." Under these circumstances, counsel for the private plan participants cannot now be heard on appeal to complain of the District Court's action.

## V.

We have considered each of the parties' remaining allegations of error. We hold that they are individually and collectively without merit.

AFFIRMED in all respects with the exception of that portion of the District Court's treatment of the award of plaintiffs' attorneys fees. The cause is REMANDED for further proceedings relative thereto.

