**Pamela J. EVANS, Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA, Defendant.**

**Civ. A. No. 2:90–1017–18.**

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 11, 1993.

888

C.D. Hopkins, Jr., North Charleston, SC, for plaintiff.

Patrick Duffy, Gayla McSwain, Charleston, SC, for defendant.

### *ORDER*

NORTON, District Judge.

## I. BACKGROUND

The plaintiff, Pamela J. Evans (hereinafter "Evans"), brought this action in state court initially for breach of contract and breach of warranty of fair dealing. Defendant, Blue Cross and Blue Shield of South Carolina (hereinafter "BCBS"), removed the case to federal court based upon this court's original jurisdiction under 29 U.S.C. § 1144(a), and pursuant to the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. § 1001 *et seq.* After removal, Evans consented to striking her plea for punitive damages.

Evans had health care coverage under a self-insured health care plan provided by her employer through the South Carolina Bankers' Association (hereinafter the "Plan"). BCBS was the Plan's claims administrator. Evans seeks reimbursement of medical expenses that she incurred after undergoing a voluntary surgical procedure to her eyes known as radial keratotomy.

BCBS admits that Evans is covered by the Plan but denies that she is entitled to reimbursement for the medical expenses she incurred resulting from radial keratotomy. The basis for that denial is that the Plan excluded coverage for medical services that are not medically necessary, that are cosmetic in nature, or that are experimental/investigational.

The case was tried before this tribunal, sitting without a jury, on October 28, 1992. Having considered the testimony and the exhibits admitted at trial, and the pre-trial briefs and proposed orders submitted to the court by the parties, this court now makes the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

## II. FINDINGS OF FACT

A. Evans had health care benefits under the Plan. BCBS was the claims administra-tor of the Plan. The effective date of the Plan was January 1, 1989. The Plan, by its terms, excluded coverage for any medical services that were not medically necessary, were experimental/investigational, or were performed for cosmetic reasons only.

B. The Plan provided a summary plan description or booklet entitled, "Group Health Insurance and Long–Term Disability Benefits Program" (hereinafter "Plan Summary"), to all Plan beneficiaries. The Plan Summary's effective date was January 1, 1989. The Plan provided a copy of the Plan Summary to Evans prior to her undergoing radial keratotomy. Evans read the Plan Summary. The Plan Summary provided, in pertinent part, the following:

> In case of cosmetic or "plastic" surgery, be sure to tell your doctor to write us in advance for written approval; otherwise, benefits may not be paid for this type of surgery.

Plan Summary, p. 14.

> Medically Necessary: benefits are payable for services or supplies that are medically necessary. The simple fact that a physician has performed or prescribed something does not mean that it is medically necessary.

*Id.* at 17.

> Some services or supplies that you get may not be covered under your insurance health policy. Expenses for the following will not be paid:
>
> —Surgery just to make you look better (usually called cosmetic surgery).
>
> —Experimental surgery or services, such as acupuncture or sex change.
>
> —Services or supplies that are not medically necessary, including luxury or convenience items and travel expenses (except those provided for human organ transplants).

*Id.* at 19.

C. Evans had myopia, or nearsightedness, which was correctable with glasses. Evans did not like to wear glasses because they were inconvenient and because they hurt her ears and nose. Evans alleged that she could not tolerate contact lenses and that

she could not see as well with contact lenses as she could with glasses. She presented no evidence, however, showing she had sought help in correcting the uncomfortableness her glasses caused, nor that she had sought medical help to enable her to wear contact lenses.

D. In approximately June of 1988, well prior to her surgery, Evans called BCBS to inquire whether the Plan would pay for radial keratotomy. BCBS informed Evans that the Plan would not pay for radial keratotomy. Evans never inquired of BCBS again regarding whether the Plan would cover radial keratotomy. No one indicated to her in any way prior to her surgery that the Plan would pay for radial keratotomy.

E. Prior to her surgery, Evans' surgeon, Dr. Sidney M. Seltzer (hereinafter "Dr. Seltzer"), told Evans that he believed BCBS would not cover radial keratotomy. Dr. Seltzer suggested to Evans that she put the cost of her surgery on her credit card. It is undisputed that Evans knew, prior to her surgery, that the Plan was not going to pay for her radial keratotomy.

F. Prior to her surgery, Evans received a radial keratotomy "kit" from Dr. Seltzer's office. Evans admitted that the kit contained the following items and information:

a. A cassette tape, entitled "About Radial Keratotomy," produced by the Vision Surgery Center, where Dr. Seltzer practices, that states radial keratotomy "has allowed thousands to be free of the inconvenience associated with nearsightedness." This tape contains several testimonials from people who have undergone radial keratotomy. Each of the people on the tape talks about how radial keratotomy has had positive effects on their lives; however, the tape contains no information about the risks associated with the procedure.

b. A booklet entitled "Vision Surgery Center."

c. A letter to the patient from Dr. Seltzer.

d. A document dated May 2, 1988, given to Dr. Seltzer's patients by Dr. Seltzer which lists self-insured companies and insurance companies which do and do not cover radial keratotomy. BCBS is not listed on this document.

e. A document entitled "Program: Luxury Item Financing based on a person's income, credit history and ability to pay." This document gives the price for radial keratotomy on one eye and explains the financing of the costs of the surgery through Chrysler First.

G. Prior to her surgery, Dr. Seltzer informed Evans that she might have to wear glasses even after she underwent radial keratotomy. She also had to sign an informed consent form before Dr. Seltzer would perform the surgery on her eyes. At no time did Dr. Seltzer indicate to anyone that this surgery was necessary for her vision.

H. Prior to her surgery, Dr. Seltzer did not attempt to determine the source of Evans' apparent intolerance for contact lenses, nor the source of the uncomfortableness or inconvenience of her glasses.

I. Evans underwent radial keratotomy to both of her eyes in May and June of 1989. A few months after surgery, Evans submitted a claim to BCBS with the hopes that BCBS would cover the radial keratotomy. BCBS denied Evans' claim on the bases that the Plan excluded coverage of expenses that resulted from medical services that are not medically necessary, are experimental/investigational in nature, or are performed for cosmetic reasons only.

J. Dr. Seltzer admitted that studies have been done by ophthalmologists in an attempt to determine the stability of the refractive effects of radial keratotomy. He agreed that one study called "Prospective Evaluation of Radial Keratotomy" (hereinafter the "PERK Study") is a highly credible study participated in by at least one ophthalmologist, Dr. Marguerite McDonald, whom Dr. Seltzer considers a recognized authority in the area of ophthalmology.

K. Dr. Seltzer admitted that he would not perform radial keratotomy on Evans' eyes until she signed an informed consent form which stated, in pertinent part, as follows:

CLINICAL INVESTIGATION

Radial keratotomy has been performed in the Soviet Union for a period of twelve

years and over 15,000 cases have been done. Over 250,000 procedures have been performed in the United States in the past eight years. A careful investigation of the operation and the possible complications is being done to establish facts about safety. I understand that I may be part of this study because my doctor considers me a candidate. I understand the study involves a minimum of one year observation of the results of my surgery. Information about the results of my surgery will be available only to investigators involved in this study and confidentiality will be maintained.

CONSENT FOR OPERATION

I understand that the longest follow-up of patients having this type of surgery is ten years and that unforeseen complications such as corneal thinning or irregularity may occur at a later time.

COMPLICATIONS OF SURGERY IN GENERAL

I understand that the performing of the surgery on my eyes is part of a clinical investigation and that periodic visits to the physician by myself will be required for at least one year to assess the results of the operation and subsequent treatment to be released to investigators and responsible authorities demonstrating a "need to know" for the clinical study described.

L. BCBS presented Dr. Ashby Jordan (hereinafter "Dr. Jordan") as an expert witness in the medical field. Dr. Jordan is the Vice–President of Medical Affairs and the Corporate Medical Director at BCBS. Part of Dr. Jordan's job is to give his opinion to the BCBS claims department regarding whether the Plan excludes coverage of a particular claim.

M. Dr. Jordan believed the Plan excluded coverage of Evans' claim. His belief was based upon Dr. Seltzer's diagnosis that Evans had myopia; upon the technical evaluation criteria (hereinafter "TEC") regarding radial keratotomy provided to BCBS by the BCBS Association at the national level; upon

the results of the PERK Study contained in the TEC; upon the Uniform Medical Policy Manual (hereinafter "UMPM") provided by BCBS Association which contains the definitions of investigational and medically necessary; upon the UMPM to determine whether radial keratotomy is still considered investigational in accordance with the policy of BCBS and whether radial keratotomy has always been considered investigational by BCBS; upon the Plan language; upon the medical literature dealing with radial keratotomy; and, finally, upon the expert medical opinion given to him by Dr. John A. Wells (hereinafter "Dr. Wells").[1] Dr. Jordan concluded that radial keratotomy was not medically necessary, was performed for Evans' convenience, and was an investigational/experimental procedure.

N. Dr. Jordan believed Evans' claim was excluded from coverage based upon the following Plan language:

"Medically necessary" means that the service, supply, or equipment received is required to identify or treat the illness or injury which a physician has diagnosed or reasonably suspects. The service, supply, or equipment must (1) be consistent with the diagnosis and treatment of the patient's condition, (2) be in accordance with standards of good medical practice, as determined by a physician's peers in the same profession, as designated by the Corporation [BCBS], (3) be required for reasons other than the convenience of the patient or his[/her] physician, and (4) be performed in the least costly setting required by the patient's condition. The fact that a service, supply, or equipment is prescribed by a physician does not necessarily mean that such service is medically necessary.

Plan, p. 3, para. 17.

O. Dr. Jordan based his opinion on categories (2) and (3) stated above. Dr. Jordan also based his opinion upon the following Plan language:

ophthalmology at the University of South Carolina Medical School. He is an ophthalmologic surgeon. He has no affiliation with either Evans or BCBS.

1. Dr. Wells has been a board certified ophthalmologist since 1971. He was the Chief of Staff at Richland Memorial Hospital in 1985 and is currently a part-time clinical professor of

1. No benefits will be provided under any Article of this plan of benefits for the following:

(a) any service or charge for service which is not medically necessary ...

(b) services or charges incurred for acupuncture, transsexuality or related procedures, or any surgical or medical procedures determined by the medical staff of the Corporation, with appropriate consultation, to be experimental, of unproven value, redundant in connection with other services, or not accepted medical practice....

*Id.* at p. 14.

P. Dr. Jordan further based his opinion on the following Plan language:

1. No benefits will be provided under any Article of this Plan or benefits for the following: ...

(j) Hospital and physician services related to cosmetic surgery, a term meaning surgical procedures performed to improve appearance or to correct a deformity without restoring the bodily function. In the instance of the following and other procedures that might be considered "cosmetic," ... benefits may only be provided if advance written approval of coverage was obtained from the Corporation [BCBS].

*Id.* at p. 15.

Q. Dr. Jordan also consulted with Dr. Wells about whether radial keratotomy should be excluded from Plan coverage.

R. Dr. Wells concluded and testified that Evans' surgery was not medically necessary because she had correctable, 20/20 vision with glasses. He also testified that radial keratotomy is an experimental procedure because the stability and predictability of its long-term effects are unknown.

S. Dr. Wells concluded also that the surgery was done only for the convenience of the patient and that this surgery may leave Evans farsighted rather than with perfect 20/20 vision.

T. Dr. Wells relied upon several medical literary articles in arriving at his expert opinion including the following:

(1) A *Journal of American Medical Association* article entitled, "Prospective Evaluation of Radial Keratotomy (PERK) Study Four Years After Surgery for Myopia," dated February 23, 1990, which concluded that further study is required to determine the extent of continued progression of the long-term stability of refractive changes that occur in a patient's eye as a result of undergoing radial keratotomy;

(2) An article from *Ophthalmology Times,* dated November 1, 1990, regarding the fact that 63% of the ophthalmologists in Norway said that they felt it was unwise to carry out such surgery on an otherwise healthy eye and that 98% of them would not choose radial keratotomy to correct their own nearsightedness;

(3) An article from *Ocular Surgery News,* dated October 15, 1990, regarding Dr. Fyodorov's finding that there is instability in vision corrected by radial keratotomy in that, postoperatively, patients' vision shifts towards being farsighted as long as 12 years after surgery;

(4) An article from *Journal of Refractive Surgery,* dated May/June, 1989, regarding the status of radial keratotomy in 1988 which concluded that radial keratotomy is elective surgery because other alternatives are available for the management of myopia, including glasses;

(5) An article from the *American Journal of Ophthalmology,* dated November of 1990, regarding a case report of a person who suffered a ruptured eye 10 years after having radial keratotomy.

Dr. Wells also relied upon his own experience in observing the surgical procedure, and upon his own experience as a practicing and teaching ophthalmologic surgeon.

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

##### 1. In General

In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the United States Supreme Court established new rules regarding the appropriate level of judicial deference, if

any, to be accorded benefit determinations by an ERISA plan administrator or fiduciary.[2] Specifically, the Supreme Court stated:

A denial of benefits challenged under [§ 1132(a)(1)(B)[3]] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Id.* 489 U.S. at 115, 109 S.Ct. at 956–57. The court noted that its holding neither distinguished between types of plans, nor focused on the motivations of plan administrators and fiduciaries. *Id.* The court, however, made clear that, if an administrator or fiduciary was operating under a conflict of interest, then that conflict must be weighed as a factor in determining whether there is an abuse of discretion. *Id.*

While the Supreme Court formulated this new rule regarding judicial review of benefit decisions, the Court failed to delineate specific guidelines about the types of language that would be sufficient to confer discretionary authority upon plan administrators and fiduciaries such that their benefit determinations would be accorded deference by the courts. The Court also failed to define the degree of judicial deference that is to be given by the courts and failed to define the standard of conduct to be met by the fiduciary/administrator to ensure that benefit decisions are not overturned by the courts. Consequently, the federal circuit courts have developed their own rules as to the interpretation and application of the *Firestone* requirements.

The Fourth Circuit, in *De Nobel v. Vitro Corp.*, 885 F.2d 1180 (4th Cir.1989), held that

language authorizing the fiduciary to determine all benefits and resolve all questions and interpretations is a sufficient grant of authority to the fiduciary or administrator to entitle the benefit decision to judicial deference. Specifically, the Fourth Circuit held:

[T]here are obviously no magic words required to trigger the application of one or another standard of judicial review. In this setting, it instead need only appear on the face of the plan documents that the fiduciary has been 'given [the] power to construe disputed or doubtful terms' or to resolve disputes over benefits eligibility. . . .

*Id.* at 1187 (quoting *Firestone*, 489 U.S. at 111, 109 S.Ct. at 954).

Furthermore, in *Richards v. United Mine Workers of America Health and Retirement Fund*, 895 F.2d 133 (4th Cir.1990), the court was faced with plan language that granted the trustees "full and final determination as to all issues concerning eligibility for benefits" and specified that its rules and regulations would be "binding upon all persons." *Id.* at 135. The court noted that the above cited language "explicitly grants the [t]rustees broad discretionary authority." *Id.*[4]

Thus, according to the most recent Fourth Circuit decisions cited above, once a court determines that plan language grants the fiduciary or administrator discretionary authority entitling its benefits determinations to judicial deference, the court's function is to determine whether the fiduciary or administrator abused its discretion in making its benefits determination. The Fourth Circuit has further stated that where there is sub-

---

2. Prior to the United States Supreme Court's landmark decision in *Firestone,* the law was well established that, where a court reviews a health care plan benefit decision, a high level of judicial deference is applicable to decisions made by plan administrators and fiduciaries under ERISA.

3. 29 U.S.C. § 1132(a)(1)(B) states: "A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . ."

4. Many other circuits have followed this line of reasoning. *See, e.g., Jordal v. Simmons,* 926 F.2d

223, 225 (2d Cir.1991) (language granting fiduciaries full and exclusive authority to determine all questions of coverage and eligibility vests fiduciary with discretion); *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 119, at n. 5 (3d Cir.1990) (language that "decisions . . . shall be final and conclusive" grants discretionary authority to the administrator); *DeWitt v. State Farm Ins. Co.'s Retirement Plan for United States Employees,* 905 F.2d 798, 801 (4th Cir.1990) ("power to construe and interpret the plan" where the administrator's "determination, constructions and interpretation . . . shall be binding" grants discretion).

stantial evidence supporting the benefits decision of the fiduciary, that decision will be upheld. *See Burdette v. Mees*, 933 F.2d 1001 (4th Cir.1991) (Table, text in WESTLAW) (unpublished disposition) (in determining if decision is arbitrary, courts may "look to see if [it] ... was based on substantial evidence"); *Boyd v. Trustees of the United Mine Workers Health and Retirement Funds*, 873 F.2d 57 (4th Cir.1989) (under abuse of discretion standard, decisions will be upheld provided they are supported by substantial evidence). The Fourth Circuit has also held that an additional factor to consider in determining whether the fiduciary abused its discretion in making its benefits determination is whether the decision is rational in light of the plan documents. *See De Nobel*, 885 F.2d at 1188 (factors to consider include whether interpretation is contrary to the language of plan).

### 2. Application

■ The fiduciary is the owner of the self-funded Plan, South Carolina Bankers' Association (hereinafter the "Fiduciary"). The claims administrator, BCBS, is an agent of the Plan owner, with the agency relationship being set forth in the Administrative Services Agreement between the owner and BCBS. The Administrative Services Agreement, which is part of the Plan document, states that, "[i]t is understood that the purchaser [South Carolina Bankers' Association or Fiduciary] retains all final authority and responsibility for the Plan and its operation...." BCBS has no conflict of interest in making a decision to deny coverage of claims because claims reimbursements are paid out of the owner's assets, not its own.

■ The Plan at issue states, in relevant part:

### 6. REVIEW OF CLAIMS DENIED IN WHOLE OR IN PART

A disposition of the claim will not be deemed final until such time as the Claims Review Committee renders its written decision.... The Claims Review Committee will send the beneficiary a written decision stating the specific reasons for its final decision with specific reference to pertinent Plan provisions.

Plan, p. 20.

"Article V—Exclusions, Limitations, and Ordinary Care"

1. No benefits will be provided under any Article of this Plan of Benefits for the following:

    a. Any service or charge for service which is not medically necessary....

*Id.* at 14. In accordance with *De Nobel*, this language grants the fiduciary the power to make a final determination concerning eligibility for benefits. Since the Plan language grants the fiduciary discretion to determine eligibility of benefits, this court cannot review the fiduciary's decision *de novo*, but must defer to the fiduciary's decision to deny coverage of Evans' claim.

### B. Analysis

■ In accordance with the Fourth Circuit legal precedent stated above, this court can find that the fiduciary abused its discretion only if Evans shows that the fiduciary made its benefit decision in an arbitrary manner, that the decision is not supported by substantial evidence, and that the decision is not rational in light of the Plan documents. This court finds that Evans has not met her burden.

■ First, Evans has not shown the fiduciary's decision was made arbitrarily. The Plan language requires the fiduciary, before excluding a medical service from coverage because it is experimental or of uncertain value, to consult with the medical staff of BCBS. BCBS, in turn, is required to seek appropriate consultation from a third party. Prior to making its final determination to exclude Evans' claim, the fiduciary obtained Dr. Jordan's opinion, who had, in turn, consulted with Dr. Wells. Therefore, since the fiduciary acted in accordance with the requirements of the Plan document, it cannot be said that the fiduciary acted arbitrarily. Additionally, Evans presented no evidence that the procedure required by the Plan is an arbitrary one. .

■ Secondly, Evans failed to show that the fiduciary's decision to deny her claim is

not supported by substantial evidence. Evans presented only the testimony of her surgeon to show that radial keratotomy is not an experimental or investigational procedure. It was her surgeon, however, who would not perform the operations until after Evans signed a consent form that referred to the operations as being part of a "clinical investigation." *See Holder v. Prudential Ins. Co. of America*, 951 F.2d 89, 91 (5th Cir.1992) (noting favorably that the trial court relied upon the fact that the beneficiary signed a consent form for treatment which noted that the procedure was an 'experimental study' in holding that the treatment was experimental for purposes of the health care policy's exclusion for experimental treatment).

■ And, lastly, Evans failed to show that the Fiduciary's decision to exclude her claim is not rational in light of the Plan documents. The Fiduciary excluded Evans' claim on the bases that the surgery was not medically necessary, was investigational/experimental, of unproven medical value, and was cosmetic in nature. The Fiduciary consulted with Dr. Jordan and Dr. Wells who both found that the surgery was not medically necessary because Evans had correctible vision and because it was being performed for the convenience of the patient rather than out of medical necessity. These doctors both found the surgery to be experimental/investigational and of unproven medical value because the long-term effects and stability of radial keratotomy are still unknown and because Evans' eyes may have been overcorrected. Both doctors also found the surgery to be cosmetic in nature and not medically necessary, mainly because Evans' sole reason for the surgery was that she hated to wear glasses.

This court finds that, in light of the Plan language, the Fiduciary's decision to exclude Evans' claim on the basis that radial keratotomy is not medically necessary and is experimental/investigational is a rational decision. The court further finds that the Fiduciary's decision to exclude Evans' claim from coverage by the Plan was not an abuse of its discretion because it was not made arbitrarily, was supported by substantial evidence, and was rational in accordance with the Plan's language.

## C. Attorney Fees and Costs

■ This court also finds that BCBS is entitled to an award of reasonable attorneys' fees and costs in accordance with 29 U.S.C. § 1132(g)(1). Section 1132(g)(1) states:

> In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

*Id.* The federal circuit courts, almost without exception, use a five-factor test to determine the parties' entitlement, if any, to costs and fees. *See Overcash v. Blue Cross and Blue Shield*, 381 S.E.2d 330 (N.C.Ct.App. 1989) (citing *Eaves v. Penn*, 587 F.2d 453, 465 (10th Cir.1978); *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 257–59 (1st Cir.1986). The five factors to be considered by the trial court are: (1) the degree of the parties' culpability or bad faith; (2) the ability of the parties to satisfy an award of attorneys' fees; (3) whether an award of fees would deter similar conduct in the future; (4) whether the parties seeking fees sought to benefit all Plan beneficiaries or resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. *Id.* at 339. Every factor will not be relevant in all cases, no single factor is determinative, and the list is not exhaustive. *Id.*

■ Under the first factor, the degree of the parties' culpability or bad faith, this court finds that Evans knew, prior to undergoing her surgeries, that the Plan would not pay for the surgeries. Additionally, Evans' doctor told her that he believed the Plan would not pay for those surgeries. This court therefore finds that there is some evidence, however slight, that Evans brought this suit in bad faith, knowing prior to any surgical procedure that BCBS would deny a later claim for reimbursement.

Regarding the second factor, the ability of the parties to satisfy an award of attorneys' fees, neither party presented any evidence on this factor. Thus, this court has not weighed this factor in making its determination.

Under the third factor, whether an award of attorneys' fees would deter similar conduct in the future, this court finds that an award of fees would deter similar plaintiffs in the future from bringing lawsuits, especially when it is known to the plaintiff prior to incurring medical costs that a plan will not provide coverage for a particular medical expense.

Under the fourth factor, whether the party seeking fees sought to benefit all Plan beneficiaries or to resolve a significant legal question regarding ERISA, this court finds that BCBS has sought to benefit all Plan beneficiaries in this case by not paying a claim that is not covered by the Plan which, in turn, leaves more funds available for those claims that are covered by the Plan.

Finally, under the fifth factor, the relative merits of the parties' positions, this court finds that the position of BCBS is of much greater merit than that of Evans. Evans underwent her surgeries despite her prior knowledge that BCBS would not pay for her surgeries under the Plan. On the other hand, BCBS consulted with Dr. Wells and Dr. Jordan and reviewed the medical literature extensively prior to making its decision that coverage could not be provided to Evans' surgeries by the Plan.

On balance, this court finds that the weight of the four factors, as set out above, falls in BCBS's favor and, therefore, it is entitled to an award of reasonable attorneys' fees and costs.

## D. Conclusion

It is therefore,

**ORDERED,** that judgment for Blue Cross and Blue Shield of South Carolina be **GRANTED.**

**ORDERED,** that Blue Cross and Blue Shield of South Carolina be entitled to an award of reasonable attorneys' fees and costs.

**AND IT IS SO ORDERED.**