

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-10-1995

# Moench v Robertson

Precedential or Non-Precedential:

Docket 94-5637

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"Moench v Robertson" (1995). *1995 Decisions.* Paper 215.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/215

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
————————————

No. 94–5637
————————————

CHARLES MOENCH
in his own right and on behalf of those similarly
situated, and on behalf of the Statewide
Bancorp Employee Stock Option Plan

v.

JOSEPH W. ROBERTSON, RICHARD D. SUTTON,
JOSEPH P. IARIA, FRANK J. EWART, JACK MEYERS,
LEONARD G. LOMELL, JOHN C. FELLOWS, JR.,
RAYMOND A. TAYLOR, ESTATE OF FRANK EWART, JOHN
EWART, ADMINISTRATOR

Charles Moench, in his own right
and on behalf of all those
similarly situated,

Appellant

————————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 92–4829)
————————————

Argued June 26, 1995

BEFORE:  MANSMANN, GREENBERG, and SAROKIN, Circuit Judges

(Filed: August 10, 1995)
————————————

Philip Stephen Fuoco (argued)
Joseph A. Osefchen
24 Wilkins Place
Haddonfield, NJ  08033

Fredric J. Gross
7 East Kings Highway
Mount Ephraim, NJ  08059

Attorneys for Appellant

Christopher J. Carey (argued)
Lisa W. Santola
Tompkins, McGuire & Wachenfeld
Four Gateway Center
100 Mulberry Street
Newark, NJ  07102

Attorneys for Appellees

Thomas S. Williamson, Jr.
Solicitor of Labor

Marc I. Machiz
Associate Solicitor

Karen L. Handorf
Counsel for Special Litigation

Eric G. Serron
Wayne R. Berry
Trial Attorneys
U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C., 20013

Attorneys for Amicus
Curiae The Secretary of
Labor

John F. Zabriskie
Raymond T. Goetz
Hopkins & Sutter
Three First National Plaza
Chicago, Ill  60602

Attorneys for Amicus

Curiae The
Federal Deposit Insurance
Corporation as Receiver
for First National Bank
of Toms River

---

**OPINION OF THE COURT**

---

GREENBERG, <u>Circuit</u> <u>Judge</u>.

This case requires us to decide the following difficult question:  To what extent may fiduciaries of Employee Stock Ownership Plans (ESOPs) be held liable under the Employee Retirement Income Security Act (ERISA) for investing solely in employer common stock, when both Congress and the terms of the ESOP provide that the primary purpose of the plan is to invest in the employer's securities.  The district court held that fiduciaries cannot be liable in such cases, and therefore it granted the fiduciaries' motion for summary judgment.  Because we conclude that in limited circumstances, ESOP fiduciaries can be liable under ERISA for continuing to invest in employer stock according to the plan's direction, we will vacate the district court's grant of summary judgment in favor of the plan fiduciaries and will remand the case to the district court for further proceedings.  In this opinion we will refer to the plaintiff-appellant Charles Moench, a plan beneficiary, as "Moench," and the defendants-appellees, the Plan Committee, the fiduciaries with investment responsibilities, singularly as the "Committee."

## I.  Introduction

## A. Statewide's Demise

Statewide Bancorp was a bank holding company with its principal office in Toms River, New Jersey. During the time relevant to this appeal, it operated through two wholly owned subsidiaries, The First National Bank of Toms River, New Jersey (FNBTR), and The First National Bank of New Jersey/Salem County.

Statewide began experiencing financial difficulties in 1989. "Between July 1989 and December 1989, the market value of Statewide Bancorp common stock fell from $18.25 per share to $9.50 per share." Dist. Ct. op. at 2. During the next year, the price fell even more precipitously -- to $6.00 per share in July 1990, to $2.25 per share in December, and finally to less than 25 cents per share in May 1991. During this period -- from 1989 through 1991 -- federal regulatory authorities repeatedly expressed concern to Statewide's Board of Directors over problems with Statewide's portfolio and financial condition. On July 31, 1989, the Office of the Comptroller of the Currency (OCC) informed the Statewide Board that "[c]ompliance management in the two subsidiary banks was found to be satisfactory in virtually all areas." Letter of July 31, 1989 at Expanded Appendix (EA) 606.[0] Nevertheless, the OCC letter indicated that "[v]iolations

---

[0] We cite the appendix as "app.," the supplemental appendix as "SA" and the expanded appendix as "EA." There is an expanded appendix because the Committee made a motion which Moench opposed to expand the appendix to include materials which were not before the district court. Ordinarily we would have denied the motion. Here, however, a significant portion of the expanded appendix consists of actual copies of documents that were summarized to the district court pursuant to Fed. R. Evid. 1006. Rule 1006 states that "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the

4

of law and regulation were found across a number of areas in the subsidiary banks [and] [w]hile management has shown a commitment to promptly correct all violations, the need to develop in certain cases and otherwise improve policies and procedures is clearly evident." Id. A March 1990 report of an off-site review of FNBTR revealed "lack of depth and quality of management, unsafe and unsound credit practices, the resulting rapid deterioration in the quality of the loan portfolio, unreliable regulatory and management reports on loans, the inadequacy of the Allowance for Loan and Lease Losses, and the adverse impact of asset quality upon earnings and capital adequacy." EA 690. Ultimately, on May 22, 1991, the Federal Deposit Insurance Corporation took control of FNBTR and on May 23, 1991, Statewide filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

**B. Statewide's ESOP Plan**

---

form of a chart, summary, or calculation," provided that "[t]he originals, or duplicates, shall be made available for examination [and t]he court may order that they be produced in court." For all practical purposes, then, these actual documents were before the district court, though the court did not feel a need to examine them. It seems to us that when a party relies on a Rule 1006 summary to support its position on an appeal, at least when, as here, the appellate court exercises de novo review over the district court decision, the appellate court similarly may examine the actual documents. Therefore, we will grant the Committee's motion to expand the appendix. We note, though, that we cite to the expanded appendix only to make clear the factual underpinnings of this appeal, and whenever possible, we include parallel citations to similar propositions in the appendix or the supplemental appendix.

5

This case involves not so much Statewide's demise but the fate during the period of its decline of funds invested in its ESOP. Beginning on January 1, 1986, Statewide offered its employees the opportunity to participate in the ESOP, which was designed to invest primarily in Statewide common stock. See Summary Plan Description at app. 174. The ESOP named various entities and gave them specific administrative and fiduciary duties. First, an ESOP Committee was set up "to administer the Plan." The Statewide Bancorp Employee Stock Ownership Plan Art. 10.1 at EA 451; app. 150 (Trust Agreement); SA 306-07 (Summary Plan Description). The plan provided that the Committee "shall adopt rules for the conduct of its business and administration of the Plan as it considers desirable, provided they do not conflict with the Plan." EA 451 (Plan, Art. 10.2); SA 307 (Summary Plan Description). The documents authorized the Committee to "construe the Plan, correct defects, supply omissions or reconcile inconsistencies to the extent necessary to effectuate the Plan, and such action shall be conclusive." EA 451 (Plan, Art. 10.4); SA 298a-299, 307 (Summary Plan Description). To allow the Committee fully and adequately to perform its duties, the plan authorized it to "contract for legal, actuarial, investment management . . . and other services to carry out the Plan." EA 451 (Plan, Art. 10.3); App. 150 (Trust Agreement); SA 307 (Summary Plan Description). According to the Trust Agreement implementing the plan, the Committee:

> shall have responsibility and authority to
> control the operation and administration of
> the Plan in accordance with the terms of the

6

> Plan and of this Agreement, including . . .
> (i) establishment, in its discretion, of
> investment guidelines which shall be
> communicated to the Trustee in writing.

Trust Agreement Art. 7.2 at app. 150-51.  The Trustee of the plan had "exclusive responsibility for the control and management of the assets of the Trust Fund," Trust Agreement at app. 150.

> The plan provided that:
> Except as otherwise provided in this Section,
> the Trustee shall invest the Fund as directed
> by the Committee.  Generally, within 30 days
> of receipt, the Trustee shall invest all
> contributions received under the terms of the
> plan not applied to the repayment of
> principal and interest on any Acquisition
> Loan in ESOP stock, except that the Trustee
> shall be authorized to invest a portion of
> the contributions received in other
> securities as a reserve for the payment of
> administrative expenses and cash
> distributions.

App. 148 (ESOP Plan, Amended and Restated Effective Jan. 1, 1989).  The plan documents gave Statewide, as the plan sponsor, "the authority and responsibility for . . . the design of the Plan, including the right to amend the Plan."  Trust Agreement Art. 7.3 at app. 151.  The plan documents also required Statewide to exercise "all fiduciary functions provided in the Plan or in this [Trust] Agreement or necessary to the operation of the Plan except such functions as are assigned to other fiduciaries pursuant to the Plan or this Agreement."  Id.

The ESOP created and governed by these documents worked as follows:  Employees became eligible to participate in the plan after one year of service.  Employees who chose to participate

7

had their contribution deducted from their salary; the employer then would match up to 50% of the employee's voluntary contribution. The plan also provided for an Employer Profit Sharing Contribution, to be made at the end of the Plan year, though only at the option of the Statewide Board of Directors.

Throughout the relevant time period, the Committee regularly invested the ESOP fund in Statewide common stock, despite the continual and precipitous drop in its price and despite the Committee's knowledge of Statewide's precarious condition by virtue of the members' status as directors. Yet the record reflects that several Statewide insiders began to have misgivings regarding the investment. Jack Breda, FNBTR's Director of Personnel, testified that when the price of Statewide stock started to drop, he began thinking it would be inappropriate to continue such investments. App. 119. He further testified that he relayed to Statewide's chief executive officer (CEO) the pension committee's recommendation that "we [should] look for other vehicles to invest money in," and that the CEO should relay that advice to the executive committee or the Board of Directors. App. 120. Apparently, the CEO reported back that the Board of Directors had rejected the proposal because "the original intent of the plan was to invest [in] Statewide Bancorp stock." App. 120. On May 13, 1991, C.T. Bjorklund, Statewide's Benefits and Compensation Manager, wrote a memorandum to Breda stating the following:

> The Statewide [ESOP] permits employees to voluntarily suspend contributions at any time during the year. The Bank can also cease

8

> contributions at any time without notice.
> Such discontinuance would not trigger a full
> vesting situation.  Only a complete plan
> termination would cause immediate full
> vesting of all participants.
> Although the ESOP gives us a beginning bias
> to hold Statewide Stock and the plan says
> that amounts contributed are to be invested
> in company stock, the trustee has the power
> to invest in other vehicles.  Potentially the
> trustee should consider investing in short
> term money market instruments with current
> and future contributions.

App. 90.  A notation from Breda to Bjorklund at the bottom of the memorandum states "I have been notified by [the CEO] on 5/21/91 that the Executive Committee of Statewide Bancorp voted not to accept the revised or restated ESOP plan . . . ."  App. 90.

Kevin William Bless, Assistant Vice President and Senior Pension Trust Officer of FNBTR testified that as Statewide's stock price fell, FNBTR's Trust Division held general discussions "about the permissibility of investing moneys in ESOP in a stock that had potential problems."  App. 136.  The Trust Division decided that since the Committee's knowledge of Statewide's precarious state was based on confidential reports issued by the OCC, it would be inappropriate to use the information in making investment decisions.  Thus, Bless testified that "the nature of the ESOP dictated that we invest solely in [Statewide] securities absent any public knowledge that it would be an imprudent investment."  App. 139.  In these discussions, then, the ESOP was not seen as absolutely requiring investment in Statewide stock.  Indeed, in early 1991 the Trustee

9

decided to cease investing in Statewide stock and to place all of the ESOP assets in money market accounts.

The Committee has not directed our attention to anything in the record to suggest that while the stock price was falling and the OCC was issuing its warning letters, the Committee met to discuss any possible effects on the ESOP or any actions that it should take and we have not found any indication that there was such a meeting. Moreover, although on June 12, 1990, investors filed a class action securities fraud suit against Statewide and certain of its directors (the Lerner action), which eventually settled for $3,200,000.00, the Committee did not participate on behalf of the ESOP and therefore the ESOP did not share in the settlement. Ultimately, Statewide's descent rendered the employees' ESOP accounts virtually worthless.

## C. The Litigation

On November 16, 1992, Moench, a former Statewide employee who participated in the ESOP plan, brought this action against the members of the Committee. These defendants were also members of Statewide's Board of Directors. However, he did not sue either the Trustee or the plan sponsor, Statewide. In his first complaint, he charged the Committee with breaching its fiduciary duties under ERISA and pleaded a securities fraud suit on behalf of the ESOP. Moench moved to certify the class and the Committee moved to dismiss the complaint. In an August 17, 1993 opinion and order (entered four days later), the district court

10

dismissed a count Moench advanced that the plan should have been amended or terminated because "[r]egardless of whether terminating or modifying the Plan would have proved to be prudent conduct, such action is not that which is encompassed within a director's fiduciary duties under ERISA."  Op. at SA 256 (citing Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1161 (3d Cir. 1990)).  The court denied the motion to dismiss the remaining ERISA counts but dismissed the securities fraud count without prejudice for failure to plead with the particularity required by Fed. R. Civ. P. 23.1.  The court requested further briefing on Moench's class certification motion. Op. at 4-5.

Moench responded by filing an amended complaint, principally under 29 U.S.C. § 1132(a)(2), for breach of fiduciary duty under 29 U.S.C. §§ 1104 and 1109.  Count 1 charged the Committee with breaching its fiduciary obligations under ERISA; Count 2 sought to hold the members of the Committee liable for breaches of their co-fiduciaries; Count 3 charged it with failing to disclose and misrepresenting pertinent information concerning Statewide's condition, that affected employees' decision to invest in the ESOP;  Count 4 charged breaches of fiduciary duties on behalf of the ESOP, including failing to file a securities fraud action on behalf of the plan; and Count 5 plead on behalf of the ESOP a securities fraud claim under 15 U.S.C. § 78 et seq. On December 20, 1993, the district court issued an order certifying a class as to the first three counts and allowing Moench to prosecute the derivative actions on behalf of the ESOP.

On July 18, 1994, Moench filed a motion for a partial

11

summary judgment declaring that the individual Committee members were fiduciaries governed by the standard of care provided in ERISA. The Committee did not oppose Moench's motion, and thus it admitted that its members were ERISA fiduciaries. The Committee nevertheless filed a cross-motion for summary judgment dismissing the complaint on the ground that it did not breach its ERISA obligations. The district court issued an opinion and order on September 21, 1994, granting both motions.

Noting that the Committee had conceded its fiduciary status, the court granted Moench's motion without analysis. The court then held that the Committee had no discretion under the terms of the plan to invest the ESOP funds in anything other than Statewide common stock. And since the plan complied with ERISA, "[Moench] has failed to establish that [the Committee's] actions in directing the purchases of stock for the Plan were other than in accordance with the requirements of the Plan or otherwise in violation of ERISA." Op. at 12. The court found no merit in Moench's allegations that the Committee gave inaccurate, incomplete and false information about the plan. Rather, it observed, "[t]he Plan specifically provides that it 'is a capital accumulation Plan [and therefore] . . . does not provide for a guaranteed benefit at retirement,'" op. at 12 (first alteration added), and that "the very nature of ESOP plans contemplates that the value and security of the employees' retirement fund will necessarily fluctuate with the fortunes of the employer because ESOPs invest primarily in employer stock." Id. Finally, the

12

court held that the statute of limitations barred Moench's derivative securities fraud suit.  Id. at 16.

Moench timely filed this appeal.  He argues that the district court erred in deciding that the plan documents absolved the Committee from any liability resulting from investing the ESOP funds in Statewide stock.  He also contends that the district court should not have dismissed his purported claim that the Committee violated ERISA by failing to file a securities fraud action on behalf of the plan.  He does not challenge the dismissal of the securities fraud suit, and, though he is not entirely clear on this point, does not appear to challenge the district court's conclusions concerning the Committee's alleged misrepresentations and omissions.  Thus, in his brief he recites that he appeals from the summary judgment on counts 1, 2, and 4 but not from the summary judgment on counts 3 and 5 of the amended complaint.  We have jurisdiction pursuant to 28 U.S.C. §1291.  The district court exercised jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).  We exercise plenary review over the district court's grant of summary judgment.

## II.  Discussion

### A.  Introduction:  ERISA's Broad Purpose

Congress enacted ERISA in 1974, "after 'almost a decade of studying the Nation's private pension plans' and other employee benefit plans."  Central States, Southeast and Southwest Area Pension Fund v. Central Transp., Inc., 472 U.S. 559, 569, 105 S.Ct. 2833, 2839 (1985) (quoting Nachman Corp. v. Pension

Benefit Guar. Corp., 446 U.S. 359, 361, 100 S.Ct. 1723, 1726 (1980)). Noting the rapid growth of such plans, Congress set out to "'assur[e] the equitable character of [employee benefit plans] and their financial soundness.'" Central States, 472 U.S. at 570, 105 S.Ct. at 2840 (quoting statute) (alterations in original). ERISA seeks to accomplish this goal by requiring such plans to name fiduciaries and by giving them strict and detailed duties and obligations. Specifically, ERISA requires benefit plans to "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). An ERISA fiduciary "shall discharge his duties . . . solely in the interest of the participants and beneficiaries" and must act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). These requirements generally are referred to as the duties of loyalty and care, or as the "solely in the interest" and "prudence" requirements. This case requires us to decide how these requirements apply to fiduciaries of ESOP plans.

**B. Are Defendants Fiduciaries as to Investment Decisions?**

Before considering the substantive questions on this appeal, we must address the Committee's argument that for the purposes of this lawsuit, dealing principally with investment

14

decisions, its members are not ERISA fiduciaries, but rather either the Trustee or Statewide was the fiduciary with respect to investments. Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). As these definitions imply, "'[f]iduciary status . . . is not an "all or nothing concept . . . . [A] court must ask whether a person is a fiduciary with respect to the particular activity in question."'" Maniace v. Commerce Bank of Kansas City, N.A., 40 F.3d 264, 267 (8th Cir. 1994) (quoting Kerns v. Benefit Trust Life Ins. Co., 992 F.2d 214 (8th Cir. 1993)) (first alteration added), cert. denied, 115 S.Ct. 1964 (1995); American Fed'n of Unions Local 102 Health and Welfare Fund v. Equitable Life Assurance Soc'y of the United States, 841 F.2d 658, 662 (5th Cir. 1988) ("A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control."). The Statewide ESOP, like most benefit plans, names several fiduciaries and allocates duties among them.

The Committee's argument that it was not the fiduciary vis a vis investment decisions faces a procedural hurdle because it did not advance that position before the district court. To the contrary, in its "Brief in Support of Defendants' Cross-Motion for Summary Judgment," the Committee stated the following:

15

> Plaintiff has filed a motion for Summary
> Judgment on the issue of whether the
> defendants were fiduciaries.  Defendants do
> not dispute that they were fiduciaries of the
> ESOP.  However, defendants argue that they
> did not breach any of their fiduciary duties.

Dist. Ct. Br. at 1.  Based on this representation, the district court quite naturally interpreted the Committee's admission consistently with the relief Moench sought in his motion.  In that motion, Moench sought a partial summary judgment declaring that the Committee members were fiduciaries vis a vis, among other things, investment decisions regarding the ESOP.  See Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment at 1 ("the members of the committee were given the power to, inter alia, . . . create investment guidelines for the ESOP, appoint investment mangers for the ESOP . . . .").  After all, that is what this case always has been about.  Thus, in the absence of any distinctions or qualifications drawn by the Committee with respect to the capacities in which its members were fiduciaries, the court granted Moench's motion and treated the Committee members as fiduciaries vis a vis investment decisions.

At the very least, then, the Committee failed to raise before the district court the argument that its members were not fiduciaries regarding investment decisions.  This omission is decisive for "[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument."  American Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 187 (3d Cir. 1995) (quoting Brenner v. Local 514,

16

United Bhd. of Carpenters and Joiners of America, 927 F.2d 1283, 1298 (3d Cir. 1991)).

In fact, the Committee's representation in the district court, when read in conjunction with the arguments it advanced in its district court brief, shows that it actually conceded that its members were fiduciaries vis a vis investment decisions. The Committee did not qualify the concession it made at the outset of its brief. To the contrary, in the argument section, the Committee contended that it "had absolutely no [discretion] regarding where to invest the plan's assets," br. at 8, and that "the [Committee] had no choice except to continue purchasing Statewide stock." Br. at 16. In other words, the Committee conceded that it was responsible for making investment decisions but argued that by complying with the ESOP provisions it complied with ERISA's fiduciary requirements. Thus, the Committee is changing course when it now argues that either the Trustee or the Sponsor was the fiduciary regarding investing the ESOP assets and that it was simply not an ERISA fiduciary in the relevant capacity. We will not permit this. See Eichleay Corp. v. International Ass'n of Iron Workers, 944 F.2d 1047, 1056 n. 9 (3d Cir. 1991), cert. dismissed, 503 U.S. 915, 112 S.Ct. 1285 (1992); Cowgill v. Raymark Indus., Inc., 832 F.2d 798, 803 (3d Cir. 1987). Thus, we hold that the Committee acted in a fiduciary capacity regarding decisions about how to invest the ESOP

17

assets.[0]  We next turn to the district court's grant of the Committee's motion for summary judgment.

### C.  The Committee's Duties Under ERISA

The first issue we address is the one on which the district court focused -- the requirements of the Statewide ESOP and ESOPs generally.  This inquiry raises the following questions:  (1)  Did the district court err in concluding that the Committee was required by the plan to invest the plan assets in Statewide stock;  (2) If so, was the Committee nevertheless constrained by the nature of ESOPs themselves to invest solely in Statewide stock?; (3)  If the plan required the Committee to invest in Statewide stock, did its fiduciary responsibilities under ERISA nevertheless require it to ignore the provisions of the plan and to diversify the plan's investments?

### 1.  The district court's decision

The district court concluded that the plan documents mandated that the Committee invest the ESOP assets solely in Statewide stock, and thus it granted the Committee's motion for summary judgment.  It appears that in reaching this result the court deferred to the Committee's interpretation of the plan.

---

[0]For the reasons set forth later in this opinion, Judge Mansmann agrees that the Committee acted in a fiduciary capacity regarding investment decisions of the ESOP assets.  She does not believe, however, that the Committee conceded the point since it maintained from the commencement of the suit that the ESOP documents did not grant it discretion in the investment of the plan's assets.

Specifically, it held that "[j]udicial review of the decisions of fiduciaries in the exercise of their powers is highly deferential and will be upheld unless the decisions are shown to be arbitrary and capricious, not supported by substantial evidence, or erroneous on a question of law."  Op. at 11.  Against this backdrop, it reasoned:

> the terms of the Plan required [the Committee] to invest the Plan funds in Statewide Bancorp Common Stock within 30 days after the end of the month in which the funds were received.  It is clear by the terms of the Plan that it did not afford any discretion in directing the investment of the Plan funds in any other manner.

Op. at 11-12.

Therefore, we initially must decide the scope of a court's review over an ERISA fiduciary's decisions.  Moench and his amici argue that the district court applied an incorrect standard of review, as in their view, in cases not involving a trustee's decision to deny benefits to a particular beneficiary, courts do not apply the deferential arbitrary and capricious standard.  Rather, they contend that the courts in such cases apply the prudent person standard.

## 2.  The Scope of Review Over an ERISA Fiduciary's Decisions

Moench relies heavily on Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325 (3d Cir. 1984), to support his argument that the arbitrary and capricious standard does not apply.  In that case, the plaintiff beneficiaries charged the defendant trustees with breaching their fiduciary

19

obligations under ERISA by failing to collect employer contributions to the plan and by applying surpluses to benefit the employers rather than the retirees. The defendants argued that the court only should have asked whether their actions were arbitrary or capricious.

At that point in ERISA's history, courts routinely borrowed the "arbitrary and capricious" standard of review governing claims brought under section 302(c)(5) of the Labor Management Relations Act, a statute that permits employer contributions to a welfare trust fund "only if the contributions are used 'for the sole and exclusive benefit of the employees . . . .'" Struble, 732 F.2d at 333 (citing LMRA). After surveying the ERISA caselaw, we observed that "[a]lthough the courts have described the applicability of the arbitrary and capricious standard in rather overbroad language, they nonetheless have limited the use of the standard to cases involving personal claims for benefits. In other cases they have consistently applied the standards set forth explicitly in ERISA." Id. And, we reasoned, there exists a qualitative difference between a personal claim for benefits and a contention that an ERISA trustee failed to act in the interest of the beneficiaries at all. We explained:

> In actions by individual claimants challenging the trustees' denial of benefits, the issue is not whether the trustees have sacrificed the interests of the beneficiaries as a class in favor of some third party's interests, but whether the trustees have correctly balanced the interests of present claimants against the interests of future claimants. . . . In such circumstances it is

20

> appropriate to apply the more deferential 'arbitrary and capricious' standard to the trustees' decisions.  In the latter type of action, the gravamen of the plaintiff's complaint is not that the trustees have incorrectly balanced valid interests, but rather that they have sacrificed valid interests to advance the interests of non-beneficiaries.

Id. at 333-34.  Because in Struble "[t]he plaintiffs allege[d] that the Employer Trustees voted to give the . . . surplus to the Employers and to reduce the Employers' contributions in order to promote the Employers' interests rather than the retirees' interests," id. at 334, we held that the trustees' actions were subject to the prudent person standard.  We then applied a de novo standard of review.

Although the plaintiff and their amici urge the mechanical application of Struble here, the facts of that case are not directly apposite.  Struble involved a decision by an ERISA fiduciary to give a benefit to the employer rather than to the beneficiary -- the fiduciary was required to decide which of two classes to favor.  And a decision in favor of one class necessarily meant that the other class "lost," that is, could not share in the benefit.  When the fiduciary's alignment with the the employer class was added to the mix, its stark, conflicted position became evident.  Here, by contrast, Moench does not contend that the Committee's interpretation of the plan and its investment decisions favored non-beneficiaries at the necessary expense of beneficiaries. Rather, the Committee's interpretation of the plan and its investment decisions occurred prior to, as

21

well as during, the period in which Statewide declined financially. Thus, the Committee did not engage in the kind of zero-sum, conflicted analysis that we looked at so warily in Struble. Actually, Moench's conflict of interest allegations really go to the second issue raised on appeal -- that the Committee members' positions as Statewide directors as well as ESOP fiduciaries made impartial decision-making regarding whether to pursue an action on behalf of the ESOP impossible. See typescript, infra, at 46-47. Moreover, unlike the situation in Struble, the Committee's investment decision was squarely in keeping with the purpose of all ESOP plans.

While Struble does not directly control, we must inquire whether its reasoning properly may be expanded to the facts here after Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 113, 109 S.Ct. 948 (1989), a case in which the Supreme Court addressed the standard of review governing claims for benefits under 29 U.S.C. § 1132(a)(1)(B). We turn to that case now.

The Firestone Court began its analysis by addressing ERISA decisions borrowing the LMRA standard of review. The Court pointed out that the arbitrary and capricious standard of review under the LMRA arose in large part because the LMRA did not provide for judicial review of decisions of LMRA trustees. Thus, the courts adopted the deferential standard of review "as a means of asserting jurisdiction over suits under § 186(c) by beneficiaries of LMRA plans who were denied benefits by trustees." Id. at 109, 109 S.Ct. at 953. ERISA, on the other hand, explicitly authorizes private causes of action. Therefore,

22

"the raison d'etre for the LMRA arbitrary and capricious standard . . . is not present in ERISA." Id. at 110, 109 S.Ct. at 954.

However, after declining to apply the LMRA caselaw, the Firestone Court did not assume that the strict standards of ERISA necessarily should be applied in a de novo fashion. To the contrary, the Court proceeded to point out that "ERISA abounds with the language and terminology of trust law" and that "ERISA's legislative history confirms that the Act's fiduciary responsibility provisions . . . 'codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.'" Id. (citation omitted) (elipses added). The Court previously had interpreted the statute and its legislative history as authorizing courts to develop a "'federal common law of rights and obligations under ERISA-regulated plans,'" id. (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56, 107 S Ct. 1549, 1558 (1987)), and in Firestone the Court further held that "[i]n determining the appropriate standard of review for actions under § 1132(a)(1)(B), we are guided by principles of trust law." Id. at 111, 109 S.Ct. at 954.

After examining the common law of trusts, the Court concluded that the language of the trust controls the ultimate standard of judicial review. Thus, "'[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion.'" Id. (quoting Restatement (Second) of Trusts § 187 (1959)). However,

23

where the trust agreement does not give the trustee power to construe uncertain provisions of the plan, or to make eligibility determinations, the trustee is not entitled to deference and courts exercise de novo review. Id. at 111-12, 109 S.Ct. at 955.

Firestone's analytical framework mandates a fresh look at the appropriate standard of review in light of the particular action being challenged. After all, Firestone seemed to require courts in all ERISA cases to examine the common law of trusts for guidance in determining the scope of review over a particular ERISA question. The situation is complicated, however, by Firestone's caveat at its outset that "[t]he discussion which follows is limited to the appropriate standard of review in §1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations." Id. at 108, 109 S.Ct. at 953. The Court then continued, "[w]e express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA." Id.

A number of courts, relying on Firestone's express limitation, have refused to apply the arbitrary and capricious standard of review to ERISA cases falling outside the category of claims for benefits even though the fiduciary involved had discretionary powers. For instance, in Ches v. Archer, 827 F. Supp. 159 (W.D.N.Y. 1993), the plaintiffs alleged that the plan administrators violated ERISA by refusing to enforce a contribution agreement against an employer. The administrators urged that Firestone compelled application of the arbitrary and capricious standard of review, because the plan granted them

24

broad discretion in their administration of the plan. The court, relying primarily on Struble, rejected the argument:

> [T]he discussion in Firestone was expressly limited to the appropriate standard of review in actions challenging denials of benefits based on plan interpretations, . . . and its holding therefore does not encompass the present case where the fiduciaries' failure to enforce the contribution payments agreement is challenged. . . . In evaluating fiduciaries' administration of ERISA plans, courts have typically applied the stricter, statutory standard of care, limiting the applicability of the more lenient, arbitrary and capricious standard only to cases where the legality of the trustees' benefit determination was at issue.

Id. at 165. More recently the Court of Appeals for the Second Circuit, relying in part on Ches v. Archer, interpreted Firestone narrowly and explicitly held that the Struble holding survived the Supreme Court's decision. In that case, John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan, 26 F.3d 360 (2d Cir. 1994), a profit sharing plan brought an ERISA claim against the committee charged with administering the plan, and alleged that by allocating certain surpluses as an employer contribution rather than to the individual beneficiaries' accounts, the committee violated its fiduciary obligations under ERISA. The court "decline[d] to apply the arbitrary and capricious standard to the fiduciary conduct at issue here because this case does not involve a simple denial of benefits, over which the plan administrators have discretion." Id. at 369. Rather, the court held that "Firestone's proposition that the more lenient arbitrary and

25

capricious standard applies where the plan grants discretion to the administrators does not alter Struble's holding that decisions that improperly disregard the valid interest of beneficiaries in favor of third parties remain subject to the strict prudent standard articulated in § 404 of ERISA." Id. In reaching its decision, the court expressed concern about the policy implications of expanding Firestone's reach: "Any other rule would allow plan administrators to grant themselves broad discretion over all matters concerning plan administration, thereby eviscerating ERISA's statutory command that fiduciary decisions be held to a strict standard." Id.

We agree with these courts that the arbitrary and capricious standard of review allowed in Firestone should not be applied mechanically to all ERISA claims, and that claims analogous to those addressed by Struble merit de novo review. But that does not mean that Firestone has nothing to say about ERISA claims falling outside the purview of section 1132(a)(1)(B) and not controlled by Struble. While the Firestone Court "express[ed] no view as to the appropriate standard of review for actions under other remedial provisions of ERISA," id. at 108, 109 S.Ct. at 953, the Court's mode of analysis is certainly relevant to determine the standard of review pertaining to all claims filed under ERISA challenging a fiduciary's performance. Specifically, the Court looked to trust law in large part because the terms used throughout ERISA -- participant, beneficiary, fiduciary, trustee, fiduciary duties -- are the "language and terminology of trust law." Firestone, 489 U.S. at 110, 109 S.Ct.

26

at 954.  That being the case, we believe that after Firestone, trust law should guide the standard of review over claims, such as those here, not only under section 1132(a)(1)(B) but also over claims filed pursuant to 29 U.S.C. § 1132(a)(2) based on violations of the fiduciary duties set forth in section 1104(a). After all, section 1104(a) also abounds with the language of trust law, and the Supreme Court previously has noted that "Congress invoked the common law of trusts to define the general scope of [fiduciaries'] authority and responsibility." Central States, 472 U.S. at 570, 105 S.Ct. at 2840.  Indeed, in Central States, the Court went on to say that "[t]he manner in which trustee powers may be exercised . . . is further defined in the statute through the provision of strict standards of trustee conduct, also derived from the common law of trusts -- most prominently, a standard of loyalty and a standard of care." Id.; see also Acosta v. Pacific Enter., 950 F.2d 611, 618 (9th Cir. 1991) ("common law trust principles animate the fiduciary responsibility provisions of ERISA.").

Our conclusion is supported by a recent decision by the Court of Appeals for the First Circuit discussing both Firestone and Struble.  In that case, Mahoney v. Board of Trustees, 973 F.2d 968 (1st Cir. 1992), the plaintiffs claimed that the trustees of a plan violated ERISA by increasing the size of retirement pensions unevenly, in a manner that "treat[ed] longshoremen who had already retired less favorably than those who were still working." Id. at 969.  The plaintiffs, relying in part on Struble, contended that because several of the trustees

27

were working longshoremen, who benefitted from the trustees' decision, the court should apply "an especially strict standard of review." Id. at 970. The court disagreed, noting that in determining the appropriate standard of review after Firestone, trust law "guides, but does not control, our decision." Id. at 971. The court then reviewed ordinary principles of trust law, as well as cases applying common law trust principles in analogous situations, and concluded that even though the trustees arguably made a decision to benefit themselves rather than the plaintiff class, trust law permitted them to be beneficiaries of the plan. Therefore, as long as they were making discretionary decisions, the arbitrary and capricious standard of review applied.

## 3. The Scope of Review Over the Committee's Interpretation

In this case, Firestone itself gives us guidance as to the standard of review over the Committee's interpretation of the plan. The Supreme Court's analysis of trust law led it to the conclusion that "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." Firestone, 489 U.S. at 111, 109 S.Ct. at 954. This conclusion is in accord with general principles of trust law, which provides that "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." Restatement (Second) of Trusts §187. Indeed, in Central States, the Court gave significant weight to

28

the trustees' interpretation of the trust agreement, because "the trust agreement explicitly provide[d] that 'any construction [of the agreement's provisions] adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers.'" Central States, 472 U.S. at 568, 105 S.Ct. at 2839 (first alteration added).

Here, the plan gave the Committee unfettered discretion to interpret its terms; it further provided that the Committee's interpretations are conclusive. Thus, assuming that the Committee interpreted the plan, the arbitrary and capricious standard applies and we will disturb its interpretation only if its reading of the plan documents was unreasonable.[0]

In this regard, the Court of Appeals for the Eighth Circuit has enumerated a series of helpful factors to consider in determining whether an interpretation of a plan is reasonable:
> (1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co., 48 F.3d 365, 371 (8th Cir. 1995) (citing Finley v. Special Agents

---

[0] Our result is in complete harmony with the prudent man standard of care obligations imposed by 29 U.S.C. § 1104 on fiduciaries, as our holding implicates only the standard of review of the conduct of a fiduciary and not the standards governing that conduct.

Mut. Benefit Ass'n, 957 F.2d 617, 621 (8th Cir. 1992)). The first factor clearly weighs in favor of the interpretation suggested by the Committee during the course of this litigation in both the district court and on appeal, i.e., that it was required without any discretion to invest in Statewide stock. As the district court recognized, ESOP plans are formulated with the primary purpose of investing in employer securities. That being the case, the Committee's interpretation is consistent with the purpose of the trust. See Restatement (Second) of Trusts § 187 Comment d (court should consider "the purposes of the trust" in determining whether trustee has abused the discretion conferred on him or her by the terms of the plan.).

However, the Committee's purported interpretation renders other language in the plan documents meaningless. For instance, the plan documents state that assets are to be invested primarily in Statewide stock. Therefore, it seems counterintuitive for the Committee to interpret the plan as requiring it to invest exclusively in Statewide stock. More importantly, the history of the Trustee's investment decisions -- actually relied upon by the Committee -- belie the reasonableness of the Committee's interpretation. The Committee concedes in its brief (apparently without realizing the consequences) that "in March, 1991 . . . the Trust Division voted not to invest any more money in Statewide's stock until the issue was clarified and instead held the fund in money market instruments." Br. at 11. With this statement, the Committee admits that the plan has been interpreted -- by the entity investing the assets -- as

30

permitting the Trustee to refrain from investing the plan assets in Statewide stock. Therefore, the language of the trust documents has not been interpreted consistently in the manner the Committee suggests. Similarly, the Committee makes inconsistent arguments on this appeal, which make us wary of adopting its interpretation. On the one hand, it argues that the plan documents did not permit it to invest in securities other than Statewide stock. On the other, it argues that it could diversify the investments only when information about Statewide's impending collapse became public.

Finally, the Committee's interpretation, particularly in light of the ambiguous language of the plan, is inconsistent with ERISA inasmuch as it constrains the Committee's ability to act in the best interest of the beneficiaries. Kuper v. Quantum Chem. Corp., 852 F. Supp. 1389, 1395 (S.D. Ohio 1994) (ESOP plan "must be interpreted, consistent with ERISA to provide that the . . . ESOP fiduciaries did possess discretion to place ESOP funds into investments other than [employer] stock, in the event that the interests of the plan participants and beneficiaries so required"); cf. Restatement (Third) of Trusts § 228(a) ("In investing the funds of the trust, the trustee has a duty to the beneficiaries to conform to any applicable statutory provisions governing investment by trustees."). Moreover, as we discuss more fully below, it is at odds with a fiduciary's responsibility under the common law of trusts, which mandates that the trustee in certain narrow instances must take actions at odds with how it

is directed generally to act. Therefore, the Committee's interpretation of the plan is unreasonable and we reject it.[0]

We need not rely solely on the unreasonableness of the Committee's interpretation during this litigation, however, because the record is devoid of any evidence that the Committee construed the plan at all. Thus, this is not a case implicating the arbitrary and capricious standard of review. The Committee points to nothing in the record indicating that it -- the <u>Committee</u> -- actually deliberated, discussed or interpreted the plan in any formal manner. To the contrary, in support of its supposed interpretation, the Committee cites actions taken by the Pension and Benefits Committee of Statewide, which it concedes "was an entity separate and distinct from the Plan Committee comprised of the defendants," br. at 9, and actions taken by the "Trust Division of FNBTR, the Trustee of the Plan," br. at 10, which also was not the Committee in charge of construing the terms of the plan. The deferential standard of review of a plan interpretation "is appropriate only when the trust instrument allows the trustee to interpret the instrument <u>and when the trustee has in fact interpreted the instrument</u>." <u>Trustees of Central States, Southeast and Southwest Areas Health and Welfare</u>

---

[0] In view of our result, we are not concerned with a situation in which an ESOP plan in absolutely unmistakeable terms requires that the fiduciary invest the assets in the employer's securities regardless of the surrounding circumstances. Consequently, we should not be understood as suggesting that there never could be a breach of fiduciary duty in such a case. We similarly do not reach Moench's argument that if the plan directed the Committee to invest the funds solely in Statewide stock, ERISA nevertheless required the Committee to ignore the plan terms when those terms conflicted with its fiduciary obligations under ERISA.

32

Fund v. State Farm Mut. Auto Ins. Co., 17 F.3d 1081, 1083 (7th
Cir. 1994) (emphasis added).  As the Restatement (Second) of

Trusts § 187, comment (h) puts it:
> The court will control the trustee in the
> exercise of a power where its exercise is
> left to the judgment of the trustee and he
> fails to use his judgment.  Thus, if the
> trustee without knowledge of or inquiry into
> the relevant circumstances and merely as a
> result of his arbitrary decision or whim
> exercises or fails to exercise a power, the
> court will interpose.

Here, there is no indication that the Committee actually made an

effort to construe the plan.  In the absence of such evidence:
> 'The extent of the duties and powers of a
> trustee is determined by rules of law that
> are applicable to the situation, and not the
> rules that the trustee or his attorney
> believes to be applicable, and by the terms
> of the trust as the court may interpret them,
> and not as they may be interpreted by the
> trustee or by his attorney.'

Firestone, 489 U.S. at 112, 109 S.Ct. at 955 (citation omitted).

As such, applying a de novo interpretation of the plan,

we have no hesitation concluding that the Statewide ESOP, while

designed with the primary purpose of investing in Statewide

securities, did not absolutely require the Committee to invest

exclusively in Statewide stock.[0]  We therefore believe that the

district court erred in determining that the Committee had no

latitude but to continue investing in Statewide stock.

The Committee nevertheless argues that it cannot be

liable under ERISA because, consistent with the nature of ESOPs

---

[0]As we have explained, we would have reached the same result
applying the arbitrary and capricious standard of review.

33

themselves, it cannot be accountable for investing the assets solely in Statewide stock.  We turn to that argument now, which again requires a detailed inquiry into the standard of review over an ESOP fiduciary's decisions.

## 4.  ESOPs and ERISA

### a.  General policies and the developed caselaw

ERISA contains specific provisions governing ESOPs. While fiduciaries of pension benefit plans generally must diversify investments of the plan assets "so as to minimize the risk of large losses," see section 1104(a)(1)(C), fiduciaries of ESOPS are exempted from this duty.  Specifically, "the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) . . . is not violated by acquisition or holding of . . . qualifying employer securities . . . ." 29 U.S.C. § 1104(a)(2).  In other words, under normal circumstances, ESOP fiduciaries cannot be taken to task for failing to diversify investments, regardless of how prudent diversification would be under the terms of an ordinary non-ESOP pension plan.  ESOPs also are exempted from ERISA's "strict prohibitions against dealing with a party in interest, and against self-dealing, that is, 'deal[ing] with the assets of the plan in his own interest or for his own account.'" Martin v. Feilen, 965 F.2d 660, 665 (8th Cir. 1992) (citing 29 U.S.C. § 1106(b)(1)), cert. denied, 113 S.Ct. 979 (1993).

The reason for these specific rules arises out of the nature and purpose of ESOPs themselves.  "[E]mployee stock

34

ownership plan[s are] designed to invest primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). Thus, unlike the traditional pension plan governed by ERISA, ESOP assets generally are invested "in securities issued by [the plan's] sponsoring company," Donovan v. Cunningham, 716 F.2d 1455, 1458 (5th Cir. 1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533 (1984). In keeping with this, ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature "an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan." Martin v. Feilen, 965 F.2d at 664. The summary plan description in this case, for example, explicitly stated that the plan "does not provide for a guaranteed benefit at retirement." App. 174.

Rather, ESOPs serve other purposes. Under their original rationale, ESOPS were described "as . . . device[s] for expanding the national capital base among employees -- an effective merger of the roles of capitalist and worker." Donovan v. Cunningham, 716 F.2d at 1458. Thus, the concept of employee ownership constituted a goal in and of itself. To accomplish this end, "Congress . . . enacted a number of laws designed to encourage employers to set up such plans." Id. The Tax Reform Act of 1976 was one of those statutes, and in passing it, Congress explicitly stated its concern that courts should refrain from erecting barriers that would interfere with that goal:

> 'The Congress is deeply concerned that the objectives sought by [the series of laws encouraging ESOPs] will be made unattainable by regulations and rulings which treat employee stock ownership plans as

35

conventional retirement plans, which reduce
the freedom of the employee trusts and
employers to take the necessary steps to
implement the plans, and which otherwise
block the establishment and success of these
plans.'

Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590 (1976) (quoted in Donovan v. Cunningham, 716 F.2d at 1466 n.24).

Notwithstanding all of this, ESOPs are covered by ERISA's stringent requirements, and except for a few select provisions like the ones we quote above, ESOP fiduciaries must act in accordance with the duties of loyalty and care. In other words, "Congress expressly intended that the ESOP would be both an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership." Martin v. Feilen, 965 F.2d at 664 (quoting 129 Cong. Rec. S16629, S16636 (Daily ed. Nov. 7, 1983) (statement of Sen. Long)). ESOP fiduciaries must, then, wear two hats, and are "expected to administer ESOP investments consistent with the provisions of both a specific employee benefits plan and ERISA." Kuper v. Quantum Chem. Corp., 852 F. Supp. at 1395.

All of this makes delineating the responsibilities of ESOP trustees difficult, because they "must satisfy the demands of Congressional policies that seem destined to collide." Donovan v. Cunningham, 716 F.2d 1455, 1466 (5th Cir. 1983) (footnotes omitted), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533 (1984). As the Cunningham court explained:
On the one hand, Congress has repeatedly
expressed its intent to encourage the

36

> formation of ESOPs by passing legislation
> granting such plans favorable treatment, and
> has warned against judicial and
> administrative action that would thwart that
> goal.  Competing with Congress' expressed
> policy to foster the formation of ESOPs is
> the policy expressed in equally forceful
> terms in ERISA:  that of safeguarding the
> interests of participants in employee benefit
> plans by vigorously enforcing standards of
> fiduciary responsibility.

Id.  See also Martin v. Feilen, 965 F.2d at 665 ("the special statutory rules applicable to ESOPs inevitably affect the fiduciary's duties under § 1104"); Kuper, 852 F. Supp. at 1394 (quoting Cunningham).  So with the goals of ESOPs on the one hand, and ERISA's stringent fiduciary duties on the other, the courts' "task in interpreting the statute is to balance these concerns so that competent fiduciaries will not be afraid to serve, but without giving unscrupulous ones a license to steal." Donovan v. Cunningham, 716 F.2d at 1466.  The goals of the two statutes often serve consistent ends -- ensuring that the fiduciary acts in the interest of the plan -- and in those cases the nature of a plaintiff's claim will not create tension.  But when the plaintiff claims that an ESOP fiduciary violated its ERISA duties by continuing to invest in employer securities, the conflict becomes particularly stark.

Nevertheless, cases addressing the duties of ESOP fiduciaries in this area generally have allowed ERISA's strict standards to override the specific policies behind ESOPs.  In Eaves v. Penn, 587 F.2d 453 (10th Cir. 1978), for example, an ESOP fiduciary argued that he was bound by both the terms of the

37

ESOP plan and ERISA itself to invest the plan assets in employer securities. The court, relying extensively on the legislative history underlying ERISA, interpreted the statutory exception as only prohibiting per se liability based on failure to diversify. It justified this conclusion by reasoning that "the structure of the Act itself requires that in making an investment decision of whether or not a plan's assets should be invested in employer securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the 'solely in the interest' and 'prudence' tests. . . ." Id. at 459.

Other decisions are more specific and have held that notwithstanding ERISA's diversification provisions, an ESOP fiduciary must diversify if diversification is in the best interests of the beneficiaries. The Court of Appeals for the District of Columbia Circuit has stated:

> [T]he requirement of prudence in investment decisions and the requirement that all acquisitions be solely in the interest of plan participants continue to apply. The investment decisions of a profit sharing plan's fiduciary are subject to the closest scrutiny under the prudent person rule, in spite of the 'strong policy and preference in favor of investment in employer stock.'

Fink v. National Sav. and Trust Co., 772 F.2d 951, 955-56 (D.C. Cir. 1985) (citations omitted). And in an opinion heavily relied upon by Moench and his amici, a district court in this circuit has held that the ERISA provisions exempting ESOP fiduciaries from the duty to diversify "merely entail that 'acquisition of employer securities . . . does not, in and of itself, violate any

38

of the absolute prohibitions of ERISA.'" Canale v. Yegen, 782 F. Supp. 963, 967 (D.N.J. 1992) (quoting Fink, 772 F.2d at 955), reargument denied in part, granted in part, 789 F. Supp. 147 (D.N.J. 1992). Rather, the court continued, "the allegation that [an ESOP] administrator has failed to prudently diversify plan assets invested exclusively in the stock of the beneficiaries' employer can state a claim for breach of fiduciary duties under ERISA." Id. at 967–68.

Notwithstanding the fact that none of these decisions specifically delineate a standard of review, Moench and his amici read these cases as requiring that a court not be deferential when reviewing an ESOP fiduciary's actions in investing in employer securities. There are numerous problems with their argument. First, by subjecting an ERISA fiduciary's decision to invest in employer stock to strict judicial scrutiny, we essentially would render meaningless the ERISA provision excepting ESOPs from the duty to diversify. Moreover, we would risk transforming ESOPs into ordinary pension benefit plans, which then would frustrate Congress' desire to encourage employee ownership. After all, why would an employer establish an ESOP if its compliance with the purpose and terms of the plan could subject it to strict judicial second-guessing? Further still, basic principles of trust law require that the interpretation of the terms of the trust be controlled by the settlor's intent. That principle is not well served in the long run by ignoring the general intent behind such plans in favor of giving beneficiaries the maximum opportunities to recover their losses.

39

In short, the sheer existence of ESOPs demonstrates that there is some value in employee ownership per se, even though participants inevitably run some risk in terms of their financial gain. Therefore, the policies behind ERISA's rules governing pension benefit plans cannot simply override the goals of ESOPs, and courts must find a way for the competing concerns to coexist. Indeed, the position taken by Moench and the Secretary of Labor leaves numerous questions unanswered: How is an ESOP fiduciary to determine when diversification is in the best interest of the beneficiaries? Is the fiduciary always to seek the return-maximizing investment, or is there some non-tangible loyalty interest served by retaining ESOP investments in employer stock? Additionally, to what extent should ESOPs be considered retirement plans, notwithstanding the qualification contained in most of them, including Statewide's, that they are not designed to guarantee retirement income? We are uneasy with the answers Moench and the Secretary would give to these questions. Both seem ready and willing to sacrifice the policies behind ESOPs and employee ownership in order to make "ESOP fiduciaries virtual guarantors of the financial success of the [ESOP] plan." Martin v. Feilen, 965 F.2d at 666. That we cannot, should not and will not do.

In this regard, we point out that the participants in the plan effectively became investors in Statewide and thus should have expected to run risks inherent in that role. The Statewide plan was voluntary and the summary plan description provides that "[e]ach individual Employee's account will

experience gains or losses according to the performance of the investments held by the Plan.  The primary investment of the Plan shall be Statewide Bancorp Common Stock."  App. 174.  Therefore, the participants should have recognized that the value of their interests was dependent on Statewide's performance.

### b.  Developing a standard

We again look to trust law for guidance in determining the standard of review.  We can formulate a proper standard of review of an ESOP fiduciary's investment decisions by recognizing that when an ESOP is created, it becomes simply a trust under which the trustee is directed to invest the assets primarily in the stock of a single company.  More than that, the trust serves a purpose explicitly approved and encouraged by Congress.  Therefore, as a general matter, "ESOP fiduciaries should not be subject to breach-of-duty liability for investing plan assets in the manner and for the . . . purposes that Congress intended."  Martin v. Feilen, 965 F.2d at 670.  And while trustees -- of both ordinary trusts and pension benefit plans -- are under a duty to "diversify the investments of the trust," see Restatement (Third) § 227(b), that duty is waivable by the terms of the trust.  Section 227(d) ("The trustee's duties under this Section are subject to the rule . . . dealing with contrary investment provisions of a trust or statute.").  Seen in light of these principles, the provision in ERISA exempting ESOPs from the duty to diversify is simply a statutory acknowledgement of the terms

41

of ESOP trusts.  And the common law of trusts in fact guides us in this difficult area.

The Restatement of Trusts provides that in investing trust funds, "the trustee . . . has a duty to the beneficiaries to conform to the terms of the trust directing . . . investments by the trustee."  Restatement (Third) § 228.  Thus, "[a]s a general rule a trustee can properly make investments in such properties and in such manner as expressly or impliedly authorized by the terms of the trust."  Id. comment (d). However, trust law distinguishes between two types of directions: the trustee either may be mandated or permitted to make a particular investment.  If the trust requires the fiduciary to invest in a particular stock, the trustee must comply unless "compliance would be impossible . . . or illegal" or a deviation is otherwise approved by the court.  Id. comment (e).  When the instrument only allows or permits a particular investment, "[t]he fiduciary must still exercise care, skill, and caution in making decisions to acquire or retain the investment."  Id. comment (f).

In a case such as this, in which the fiduciary is not absolutely required to invest in employer securities but is more than simply permitted to make such investments, while the fiduciary presumptively is required to invest in employer securities, there may come a time when such investments no longer serve the purpose of the trust, or the settlor's intent. Therefore fiduciaries should not be immune from judicial inquiry, as a directed trustee essentially is, but also should not be subject to the strict scrutiny that would be exercised over a

42

trustee only authorized to make a particular investment. Thus, a court should not undertake a de novo review of the fiduciary's actions similar to the review applied in <u>Struble</u>. Rather, the most logical result is that the fiduciary's decision to continue investing in employer securities should be reviewed for an abuse of discretion.

In light of the analysis detailed above, keeping in mind the purpose behind ERISA and the nature of ESOPs themselves, we hold that in the first instance, an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

In attempting to rebut the presumption, the plaintiff may introduce evidence that "owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust." Restatement (Second) § 227 comment g.[⁰] As in all trust cases, in reviewing the fiduciary's actions, the court must be governed by the intent behind the trust -- in other words, the plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with

---

[⁰]This quote derives from the Second Restatement, though the section we quote has been amended by the Restatement (Third) of Trusts.

the settlor's expectations of how a prudent trustee would operate. In determining whether the plaintiff has overcome the presumption, the courts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive. See Kuper, 852 F. Supp. at 1395, ("defendants who attempted to diversify its ESOP assets conceivably could confront liability for failure to comply with plan documents").

In considering whether the presumption that an ESOP fiduciary who has invested in employer securities has acted consistently with ERISA has been rebutted, courts should be cognizant that as the financial state of the company deteriorates, ESOP fiduciaries who double as directors of the corporation often begin to serve two masters. And the more uncertain the loyalties of the fiduciary, the less discretion it has to act. Indeed, "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'" Martin v. Feilen, 965 F.2d at 670 (citation omitted). As the Feilen court stated in the context of a closely held corporation:

> [T]his case graphically illustrates the risk of liability that ESOP fiduciaries bear when they act with dual loyalties without obtaining the impartial guidance of a disinterested outside advisor to the plan. Because the potential for disloyal self-dealing and the risk to the beneficiaries from undiversified investing are inherently great when insiders act for a closely held corporation's ESOP, courts should look closely at whether the fiduciaries

44

> investigated alternative actions and relied
> on outside advisors before implementing a
> challenged transaction.

Id. at 670-71.  And, if the fiduciary cannot show that he or she impartially investigated the options, courts should be willing to find an abuse of discretion.

When all is said and done, this is precisely the argument Moench makes in this case:  that the precipitous decline in the price of Statewide stock, as well as the Committee's knowledge of its impending collapse and its members' own conflicted status, changed circumstances to such an extent that the Committee properly could effectuate the purposes of the trust only by deviating from the trust's direction or by contracting out investment decisions to an impartial outsider.

Because the record is incomplete, we cannot determine whether the Committee is entitled to summary judgment. Therefore, we will remand the matter to the district court for further proceedings in which the record may be developed and the case may be judged on the basis of the principles we set forth.[0]

### D.  Failure to bring derivative action

Moench and the Secretary of Labor appear to argue that the district court erred by failing to address Moench's claim

---

[0] Moench contends that he raised a number of other fiduciary breaches before the district court, independent of the Committee's investment in Statewide stock.  Furthermore, Moench contended at oral argument that the Committee engaged in self-dealing prohibited by ERISA.  This opinion is limited to the issues discussed; it is up to the district court to determine whether these other claims are adequately plead, and if so, how to proceed with them.

45

that the Committee violated ERISA by failing to file a claim against Statewide's directors on behalf of the ESOP.

Actually, Moench's argument is somewhat unclear.  In his statement of issues presented, Moench asks whether "ERISA [is] violated when pension plan administrators exonerate themselves of personal liability to the plan by excluding the plan from participation in the settlement of a class action securities fraud suit against some of the plan administrators, and by letting limitations run out without investigating the wisdom of the plan bringing its own securities fraud suit?"[0]  Br. at 1.  However, the corresponding portion of the brief's argument section is entitled "Failure to have the ESOP pursue any securities fraud claim was a prejudicial and actionable breach of fiduciary duty."  Br. at 24 (emphasis added).  In that section, Moench argues that "the defendant[s] . . . clearly and unequivocally had a duty to pursue a derivative action against three of their own number as well as the plan sponsor, whom the members served as corporate directors."  Br. at 27.  For his part, the Secretary of Labor makes a different, more general argument:  "The district court did not address the plaintiff's claim that the defendants breached their fiduciary duties under ERISA by failing to take steps on the ESOP's behalf as

---

[0]The record shows that a shareholder's derivative action was filed against Statewide, Lerner v. Statewide Bancorp., Civ. No. 90-1552, which named, among others, three of the defendants in this suit.  That action eventually settled, and the ESOP was excluded from the settlement.

46

shareholder to remedy corporate fiduciary breaches committed by FNBTR's directors." Amicus Br. at 23.

The confused arguments urged on this appeal, and the conflicting descriptions of what was raised in the district court, is not surprising, considering that Moench made an entirely different argument before the district court. The issue of the Committee's duty to take affirmative legal action was raised below only as part of a still different argument that "[t]here are numerous questions of fact surrounding defendants' conflict of interest." Plaintiff's Mem. of Law in Opp. to Def. Mot. for Sum. Jud. at 25. Moench argued in the district court that "the defendants, having knowledge that the bank was fraudulently understating the true extent of its financial difficulties, had a duty to act on this knowledge, even if it was not public knowledge. Moreover, this duty may have included a duty to bring a derivative action on behalf of the ESOP, even if it meant suing themselves as directors." Id. at 29 (emphasis added). It appears from a fair reading of his brief in the district court -- though it is by no means crystal clear -- that Moench was urging that the Committee breached its ERISA duties by failing either to resign as ESOP trustees or to assign the investment decisions to an independent outside source. Thus, Moench concluded the conflict of interest section in the brief below by stating: "It is submitted that after receipt of the March 1990 OCC report, and the filing of the Lerner action, these two duties [of director and ESOP fiduciary] became irreconcilable." Id. at 30.

At any rate, our resolution of the issues discussed above, which requires that we vacate the grant of summary judgment and hence resurrects Moench's complaint, makes it unnecessary for us to reach this issue. Upon remand, Moench may seek to file a motion to amend his complaint to make clear precisely what he is arguing on this score.[0]

### III. Conclusion

For the foregoing reasons, we will vacate the district court's order of September 21, 1994, granting summary judgment on counts 1, 2, and 4 of the amended complaint, and will remand the matter to the district court for further proceedings consistent with this opinion.

---

[0] We stress that the standard of review we apply over an ESOP fiduciary's investment decisions does not necessarily apply over a claim that an ESOP fiduciary failed to take action to protect the ESOP assets. If the district court reaches this "failure to sue" issue on remand, it should determine in the first instance the appropriate standard of review. In making that determination, the court should consider whether <u>Struble</u> controls.

48